## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| TAYLOR COSTELLO, individually and on behalf of all others similarly situated, | ) ) ) | **CLASS ACTION** |
| *Plaintiff*, | ) ) | **Case No. 2:22-cv-00035-TAV-CRW** |
| vs. | ) ) ) | |
| MOUNTAIN LAUREL ASSURANCE COMPANY, an Ohio Corporation | ) ) ) | |
| *Defendant*. | ) | |

## <u>MOTION FOR CLASS CERTIFICATION</u>

Plaintiff Taylor Costello's ("Plaintiff") causes of action are straightforward, with uniform facts well-supported by common evidence, and are eminently suitable for class treatment. As such, pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks to certify the following class:

> All persons who made a first-party claim on a policy of insurance issued by Mountain Laurel Assurance Company to a Tennessee resident who, from April 7, 2016, through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell (i.e. Report code = "COMP") and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

All prerequisites for class certification set forth in Rule 23(a) are satisfied, and class treatment is proper under Rule 23(b)(3).

## I.    INTRODUCTION

Under basic appraisal standards, calculating the actual cash value ("ACV") of a vehicle using the comparable or "comp" methodology is done by taking the average price of comparable vehicles, adjusted for any observed and verified differences between each respective comparable vehicle and the insured vehicle in mileage, equipment, and condition. Adjustments to the price of comparable vehicles cannot be based on unverified assumptions, to say nothing of purposely discarding and ignoring data that undermines such assumptions. But that is precisely what Defendant Mountain Laurel Assurance Company ("Progressive")[1] does in determining its insureds' ACV. In the modern used-auto market, dealers price vehicles to market and list vehicles for sale on the Internet at that market price. Data on millions of used car transactions confirm this by showing that vehicles typically sell for the advertised price. This case exists because Progressive ignored the reality of how the modern used auto market operates, ignored the empirical

---

[1] Mountain Laurel is a subsidiary of Progressive Corporation. Because the parties have stipulated to using prior discovery and depositions from other cases that refer to "Progressive," Plaintiff refers to Mountain Laurel throughout this motion as "Progressive."

1

data of vehicle transactions, and ignored appraisal standards for calculating the market value of insured vehicles, in order to engage in a uniform practice of undervaluing totaled vehicles.

It is undisputed that when insureds suffer a total loss to their vehicles, Progressive's form insurance policy ("Policy") requires payment of ACV, less any deductible. Progressive determines ACV using the comparable or "comp" method, but it makes a critical departure from that otherwise industry-standard methodology: Before making adjustments to comparable vehicles based on verified differences in equipment, condition, and mileage, Progressive reduces the list prices of comparable vehicles by applying a "Projected Sold Adjustment" ("PSA") of ███, on average, that it (falsely) represents is the amount consumers can negotiate off the advertised price in a cash transaction. This lone speculative adjustment is invalid because it is not based on verified information (in fact, it is based on deliberately manipulated data) and is based on a verifiably false assumption about the used car market.

Auto industry experts explain that Progressive's assumption underlying the PSA—that dealerships overprice vehicles and consumers typically negotiate down from that advertised cash price—reflects a *long*-outdated understanding of the used car market. Given the ubiquity of Internet shopping and the development of sophisticated pricing tools, car dealerships now aggressively price vehicles to market—in other words, the list price must reflect the actual cash market value—because otherwise consumers who can compare advertised prices from the comfort of their own home will never visit a dealership advertising an inflated price. This is not conjuncture but, rather, is fact confirmed by millions upon millions of used car transactional data, ███████
███████████.

So how can Progressive possibly justify slashing the list prices of used vehicles used to determine ACV by (on average) ████? The answer is shocking: Progressive and its vendors

2

exclude from the PSA calculation 

Attached as Exhibit 1 is a graphical portrayal of the S/L Ratio of millions of vehicles, which shows vehicles typically sell for list price.

Because Progressive and its vendors deleted from the data all transactions where a vehicle sold at or above its listed price, Plaintiff purchased a transparent data set of listed and sold vehicle prices. Plaintiff's expert matched more than 7 million list-price and sold-price records by VIN number. This unadulterated dataset shows that *the median S/L Ratio is 1*. This is significant: The empirical data confirm list prices are equivalent to market value—just as the used car industry experts opine.

In short, the PSA is capricious, arbitrary, and outright false. Class treatment will ensure that, after Plaintiff proves her case, insureds will receive the benefits they are entitled to and paid premiums to receive: the market value of their totaled vehicles. Once the PSA is excised from each Class member's detailed individual valuation report, the Mitchell reports document a sound appraisal of ACV following the customary comp methodology.

This case is eminently suitable for class treatment: Plaintiff's claims are based on (1) identical form contract language and (2) practices that applied uniformly across the Class. Plaintiff's theory is that the PSA deduction can *never* be applied under the Policy, while Progressive's is that it can *always* be applied. Whether a jury agrees with Plaintiff or Progressive,

resolution of that question will resolve virtually the entirety of Class members' claims in a single stroke. Thus, this Court should grant class certification.

## I. RELEVANT FACTUAL BACKGROUND

### A. Progressive's Form Policy Terms and Uniform Procedures

Progressive uses form insurance policies with materially identical language. Ex. 2 ("Retton Dep.") at 26-29.[2] In Section IV of the Policy, Progressive promised to pay for "loss" to covered autos. Ex. 3 (Policy) at 16. In the "Limit of Liability" subsection, Progressive limits its liability to the vehicle's ACV, *id.* at 20, and states that ACV will be based on the "market value, age, and condition" of the vehicle, *id.* at 21. Plaintiff and Class members experienced what Progressive determined to be a total loss. Ex. 4 ("Silver Dep.") at 27, 30.[3] Consistent with its Policy terms, Progressive's uniform practice is to base total-loss payments on the vehicle's ACV (albeit in an insufficient amount).

### B. Progressive's Total-Loss Valuation Methodology

Progressive's methodology for valuing total-loss vehicles is to utilize a third-party vendor, Mitchell, to generate a vehicle valuation report. Retton Dep. at 37-38, 55-59. ███████████████

███████████████████████████████████████████████████████████████

███████████ *Id.* at 37-38, 40-42; Ex. 5 ("Kroell Dep.") at 20. ██████████████████

---

[2] By agreement of the parties, the deposition of John Retton taken in *Drummond, et al. v. Progressive Specialty Ins. Co., et al.*, 5:21-cv-04479-EGS (E.D. Pa.) and *Freeman v. Progressive Direct Ins. Co.*, 1:21-cv-03798-DCC (D.S.C.) are being used in this case in lieu of retaking that deposition, because the issues that would be covered are the same.

[3] By agreement of the parties, the depositions taken in *Volino v. Progressive Cas. Ins. Co.*, 1:21-cv-06243-LGS (S.D.N.Y.) of Michael Silver, Phillip Kroell, and Blaine Bogus are being used in this case in lieu of retaking those depositions, because the issues that would be covered are the same.

██████████████████████████████ of calculating ACV. Retton Dep. at 37-38, 41-42, 55-59.

████████████████████████████████████████ *Id*. at 37, 51, 59. Then, it applies a PSA deduction to these list prices, purportedly to "reflect consumer purchasing behavior (negotiating a different price than the list price)." Retton Dep. at 42-43, 75; *see also* Ex. 6 ("Costello Report") at 9. In other words, Progressive's position is that car dealerships uniformly price vehicles above market and negotiate down to the actual market value—thus, according to Progressive, the advertised prices must be reduced by a PSA of ████████████ The new "price"—reduced by the PSA—of each comparable vehicle is then adjusted based on observed and documented differences, if any, in mileage or equipment. Kroell Dep. at 142-143

██████████████████████████████. *Id*. at 144-45. ████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████ *Id*. at 145. ████████████

████████████████████████████████████████

████████████ Retton Dep. at 74. ████████████████████████

████ Ex. 8 ("Lacey Report") at 9-12.

C. **Imposing a PSA is Inconsistent with Market Realities and Appraisal Standards**

Progressive's assertion that list prices of comparable vehicles are bloated and that consumers routinely negotiate advertised prices down is belied by market forces. Plaintiff's expert explains Progressive's is an outdated and false characterization of the market. Ex. 7 ("Felix Rep.") at 2-3. ***Many*** years prior to the Class period, it was perhaps a fair characterization of market forces: Without Internet advertising and sophisticated pricing tools, the "sticker" price was not really a

5

factor—consumers went to the local dealership with the desired vehicle type and could not easily compare listed prices across numerous dealerships. *Id*. at 3. Now, not only can dealers identify the precise amount at which comparable vehicles are listed in the market, but so too can consumers—and if the dealership prices above market, consumers will know it and will patronize competing dealerships who priced to market. *Id*. at 3-5.

This does not mean vehicles invariably sell for the precise listed price—there are numerous reasons unrelated to actual ***cash*** value why vehicles sell for less or more than listed price. For example, a dealership might sell a vehicle for less than list price if, inter alia, (1) they are getting points on a loan; (2) there is a special discount (military, employee, friends/family); (3) a consumer is entitled to apply a "credit" earned through use of the service department; or (4) the purchaser had an attractive trade-in that incentivized the dealership to sell at a below-market price so as to obtain the trade-in vehicle. *Id*. at 6-8. But these reasons "have nothing to do with the actual market price of a vehicle." *Id*. at 8.

Additionally, Plaintiff's appraisal expert explains the "comp" methodology Progressive utilizes is essentially a line-item method to arrive at the ACV of damaged property, pursuant to which appraisers take the list prices of comparable vehicles and make line-item adjustments for documented differences between the comparable vehicle(s) and insured vehicle in mileage, equipment, and condition. Ex. 9 ("Merritt Rep.") at 2-4. Any adjustment must be based on observed, documented, and verifiable data. *Id*. Other than the PSA, Mitchell's method is consistent with this standard and documents a detailed, sound appraisal of each loss vehicle that Progressive presents to the insured as ACV. *Id*. at 7-8.

But Progressive deviated from proper appraisal standards in applying the PSA. *Id*. at 4-7. Because the PSA is not based on observed, verified data, it is necessarily arbitrary and inconsistent

with proper appraisal standards. *Id*. at 6-7. As Merritt explains, the proper method for identifying a vehicle's ACV is to take the average price of comparable vehicles, adjusted for documented differences in mileage, condition, and equipment. *Id*. at 2-4. As such, the market value of every Class member's vehicle is identified in the valuation reports. *Id*. at 7. Simply remove the PSA deductions, and the detailed valuation report identifies the vehicle's ACV.

**D. To Calculate the PSA, Progressive Ignores and Deletes Market Data That Disproves Its Market Theory**

Notwithstanding these market realities and standards, Progressive imposes a PSA deduction that averages ███ Lacey Report at 13. This is in line with the ████████████ ████████████████████████████████████████████, *id*., and is achieved by manipulating (and then misrepresenting) the data.

Here is how it works: ████████████████████████████████████████ ████████████████████████ Ex. 10 ("Bogus Dep.") at 17-18. ████████████ ████████████████████████████. *Id*. at ████████████████████ ████████████████████████████████████ *Id*. at 21-22. The Bogus Team's data is a black box. ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ Bogus Dep. at 155:18– 156:16. ████████████████████████████████████████████████████ ████████████████████████████████████████ Nevertheless, Progressive accepts the PSA without question as a basis for reducing its insureds' ACV payments.

The most shocking part of this scheme is that, ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Bogus Dep at

7

57-60; Lacey Report at 3-██████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████. Bogus Dep. at 57-58, 61-63. ████████████████████████

██████████████████████████████████████████████████. Lacey

Report at 4. ████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████. *Id.* & Exhibit

8 thereto at 2.

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Bogus Dep. at 137; Lacey Report at 4-5. For a vehicle to

sell for higher than its listed price is not an outlier or an oddity. Felix Rep. at 8-10. Mr. Martin

identified that 23.47-29.93% of vehicles were reported to the DMV as sold for more than listed

price. Ex. 12 (Martin Rep.) at ¶¶ 25, 27, 30, 32, 34, 37, 39, 41, 44, 46, 48, 51.

Moreover, the Bogus Team ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████, ██████████████████████████████████. Bogus

Dep. 73:22–75:5. Instead, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ *Id.* at 74:20–75:5. Consider that one of the primary reasons a vehicle might

sell for less than list price is that a dealership simply offered less than it otherwise would have on

a vehicle trade-in—or it might be incentivized to sell for a below market price because the purchaser has an attractive trade-in. Felix Rep. at 6-7. Not only are these instances unrelated to actual market value, they are irrelevant in the context of total-loss insureds, as they have no vehicle to trade in.[4] Also, instances where a dealership might chop a few hundred dollars off list price because the consumer is financing the purchase through the dealership—meaning it will more than make up the profit difference—are irrelevant because Progressive owes actual **cash** value, not actual financed value. And that some people may be entitled to a discount is irrelevant to the ***actual*** market value.

Unfortunately, in response to Plaintiff's subpoenas, Progressive's vendors ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ So Plaintiff retained a statistician, Jeffrey Martin, to analyze a large set of transparent data reported by all dealers to state DMV offices. Mr. Martin identified a robust sample size of 1.4 million-2.4 million matches *per year*. Martin Rep. at ¶¶ 25, 32, 39, 46. The results confirm Mr. Felix's testimony: The median S/L Ratio for each year is 1 (meaning sold and list price is equal), regardless of whether all transactions are considered or if outlier ranges are applied. *Id*. at ¶¶ 25, 27, 30, 32, 34, 37, 39, 41, 43, 46, 48, 51. The mean S/L ratio is negligible 0.995-to-1 (meaning sold prices were, on average, 0.05% lower than listed prices, at most). *Id.* at ¶¶ 34, 37, 41, 43, 48, 51, 54, 57. These findings confirm that list

---

[4] There are numerous other flaws in the Bogus Team's statistical analysis, as set forth in Dr. Lacey's Report and the Appendix thereto. Critically, Dr. Lacey, for purposes of the Appendix, essentially adopted the Bogus Team's assumptions and demonstrated that even when accepting such flawed assumptions, the Bogus Team's analytical approach does not faithfully represent the transaction data.

price equates to market value and, thus, that the PSA deduction is invalid. These results are summarized in the figures and tables in Exhibit 1.

In short, instead of looking at their data honestly, Progressive and its vendors began with a forgone conclusion: "Consumers negotiate down the advertised cash price of a vehicle." They then manufacture "support" and thumb the scale by ignoring and deleting all market data to the contrary. Once this lone invalid adjustment is removed, each Mitchell Report documents a good faith appraisal of each Class Member's loss vehicle. Certifying this case for class treatment is proper under well-established law and will ensure Class Members receive the ACV they are entitled to, and paid premiums for, under their Policies.

## II.  ARGUMENT

To certify a class, the four prerequisites of Rule 23(a) must be satisfied, along with at least one of the requirements listed in Rule 23(b). *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, 722 F.3d 838, 850 (6th Cir. 2013). While courts may consider the merits of the plaintiff's underlying claims to determine if Rule 23's requirements have been satisfied, this does not extend to a free-ranging merits inquiry. *See Amgen, Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "In other words, district courts may not 'turn the class certification proceedings into a dress rehearsal for the trial on the merits.'" *In re Whirlpool*, 722 F.3d at 851 (quoting *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012)). District courts have discretion in determining whether class treatment is appropriate. *See Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 504 (6th Cir. 2015). But if a plaintiff shows the Rule 23 elements are met, the discretion disappears. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399 (2010) (Rule 23 "creates a categorical rule entitling a plaintiff who satisfies the Rule's elements "to pursue his claim as a class action.").

### A. THE CLASS IS ASCERTAINABLE

A threshold requirement for certification under Rule 23(b) is the class must be ascertainable. *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016). The Sixth Circuit has held that a class is ascertainable where the "class definition [is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d, 532, 537-38 (6th Cir. 2012) (citing 5 James W. Moore et al, *Moore's Federal Practice* § 23.21[1] (3d ed. 1997)). This includes circumstances where class members can be determined through reference to objective data. *See Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014).

As detailed in Dr. Lacey's Report at pages 9-12, the parties and the Court can determine if someone is a Class member based on objective, identifiable criteria in the electronic claims data and documentation maintained by Progressive. Every criterion for membership—insured by Progressive, date of loss, whether it was a covered total-loss claim, whether it was based on a Mitchell Report, and whether a PSA was applied—is objective, not subjective criteria such as state of mind. *Compare, e.g.*, *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 97 (S.D.N.Y. 2009) ("An identifiable class exists if its members can be ascertained by reference to objective criteria") *with Simer v. Rios*, 661 F.2d 655, 659 (7th Cir. 1981) (class members could not be identified absent the "Sisyphean task" of deciphering their state of mind).

As the Sixth Circuit has explained, ascertainability is not defeated simply because it may necessitate a manual review of individual claims files, provided that the characteristics to be reviewed rest on objective criteria. *See Young*, 639 F.3d at 539-40 ("Plaintiffs' classes are defined by classic categories of objective criteria . . . the need to manually review files is not dispositive. If it were, defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their businesses or the manner in which their business

11

records were maintained."). Here, identification of Class members can be made based *solely* on Progressive's own records—and although it may require looking at individual Reports, this does not preclude certification. *Id*.

## B. COMMON ISSUES PREDOMINATE

Under Rule 23(a)(2), there must be questions common to the class; meaning, there is at least one question the answer to which "will resolve an issue that is central to the validity of [each claim] in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). A plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject only to individualized proof. *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2017). Issues which satisfy the predominance inquiry are those where the same evidence suffices for each class member or there is a central issue susceptible to class-wide proof. *Tyson Foods, Inc. v. Bouphakeo*, 577 U.S. 442, 453 (2016) (citing 2 W. Rubenstein, *Newberg on Class Actions* § 4:50, pp. 196-97 (5th ed. 2012)). Importantly, common issues may predominate even where there are individualized damages issues. *Beattie*, 511 F.3d at 564.

### 1. The elements of the breach of contract claim are subject to common proof that predominate over any individual questions.

Commonality is satisfied because whether Progressive's application of the PSA to comparable vehicles' listed prices constitutes a breach of the form Policy is subject to common proof, and thus its answer will apply equally to all Class members. Whether a breach occurred turns on two key questions, both of which are subject to common evidence: (1) whether the PSA deduction is baseless and invalid, considering the data ignored and discarded from the calculation and evidence about dealer pricing practices in the modern used car market, and (2) whether under the standard appraisal "comp" method, the invalid PSA deduction may be excised from insureds' valuation reports to arrive at a proper ACV amount. Moreover, ███████████████████

12

██████████████████████████████████ Retton Dep. at 26-29. The central question is whether application of the PSA means, as Plaintiff suggests, Progressive is not calculating "market value" as contractually required but is, instead, calculating an artificially reduced amount. *See Smith v. S. Farm Bureau Cas. Ins. Co.*, 18 F.4th 976, 980-81 (8th Cir. 2021) (holding that if it were true that the PSA is "contrary to industry practices and consumer experiences and therefore not reflective of the vehicle's fair market value, then the insurance company did not consider the truck's fair market value; it considered an artificially lower value, in breach of its contractual duty") (cleaned up); *see also Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 2:20-cv-2482-TLP-cgc, 2022 WL 17592417, at *6 (W.D. Tenn. Sept. 26, 2022) ("The issue here instead is whether Defendant knowingly and without explanation reduced the cash value for Plaintiff's total loss vehicle using a single line-item deduction in its routine claims-settlement practice") (holding that insured had stated a claim for breach of contract where insurer utilized a uniform deduction to supposedly account for consumer negotiating behavior). Resolving this issue is the crux of this case and will resolve the dispositive issue in every Class members' claim, satisfying the commonality requirement.

These common issues predominate over individual issues. The elements of breach of contract under Tennessee law require evidence of (1) an enforceable contract, (2) a breach, and (3) damages resulting from that breach. *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). It cannot be disputed that the first element is subject to common proof, as Progressive has already identified every total-loss insured covered by its policies during the relevant time-period.

The breach element is also subject to common proof: (i) the form Policy language applicable to every Class member, which establishes the relevant duty; (ii) expert testimony that dealerships price to market and therefore the list price of comparable vehicles is reflective of cash

market value, as reflected by even Progressive's own purposely truncated market data and by the DMV data; and (iii) expert testimony that the PSA is unjustified, arbitrary, capricious, and not reflective of the used car market. None of the testimony is particular to a given vehicle: Plaintiff's statistical experts will provide their analysis that the PSA is not supported by a proper statistical methodology or by the data, which the jury will find persuasive or not, but it is not particular to specific vehicles. Felix will testify that, as reflected in the data, car dealers price to market, which the jury will find persuasive or not—either way, such testimony applies classwide. Merritt will testify that the way to identify ACV is to take the average of comparable vehicles, adjusted for differences in mileage, equipment, and condition—in other words, the Mitchell method but without the PSA. A jury will either agree or not, but either way, the outcome will apply equally to the Class.

Moreover, as this Court previously held, Plaintiff plausibly alleged that Progressive's methodology violated Tenn. Comp. R. & Regs. 0780-01-05-.09(1)(b). Dkt. No. 56 at 23-24. Progressive's methodology—and the Mitchell Valuation Report—was precisely the same as to all Class Members. As such, if such method constitutes a violation of the Total Loss Regulation, it constitutes such a violation as to all members of the Class. Moreover, Plaintiff's appraisal expert has demonstrated this violation of the Total Loss Regulation caused each Class Member damages in the amount of the PSA deduction.

In sum, the jury will be presented with two competing viewpoints. Progressive's witnesses will testify that the PSA is a proper part of its uniform method of calculating ACV. Plaintiff will also proffer a uniform method of calculating ACV, but her witnesses will testify that the PSA is invalid, in conflict with market forces and vast empirical evidence, and not a proper element of calculating ACV. Regardless of whether a jury agrees with Progressive or Plaintiff, its answer will

14

apply classwide—and as such, the predominating question in this litigation is common to the Class and liability issues subject to common proof predominate over any issues subject only to individual proof.

**2. The elements of a claim for breach of the covenant of good faith and fair dealing are subject to common proof that predominate over any individual questions.**

Predominance is also satisfied with respect to whether Progressive's application of the PSA to comparable vehicles' listed prices constitutes a breach of the covenant of good faith and fair dealing. In Tennessee, "[a] covenant of good faith and fair dealing is implied in every contract, and as a result of this covenant, each contracting party promises to perform its part of the contract in good faith . . . ." *Lott v. Swift Transp. Co., Inc.*, 694 F. Supp. 2d 923, 931 (W.D. Tenn. 2010). In particular, "[i]nsurance policies are contracts of the utmost good faith and must be administered and performed as such by the insurer." *MFA Mut. Ins. Co. v. Flint*, 574 S.W.2d 718, 720 (Tenn. 1978). Whether a breach of the covenant of good faith and fair dealing occurred turns on the same two questions relevant to the breach of contract claim. As stated above, all Class members were subject to the same Policy language and business practices. The central question is whether application of the PSA means, as Plaintiff alleges, that Progressive is not calculating "market value," but is instead calculating an artificially reduced amount. These common issues predominate over individual issues. Moreover, to take just one example, Plaintiff alleged, as this Court noted, that Progressive failed to undertake any investigation or analysis into whether the PSA is legitimate, reflects market forces, and is based on sound empirical data. Dkt. No. 56 at 26; *see also Watson v. Progressive Direct Ins. Co.*, 2022 U.S. Dist. LEXIS 233630, at **35-36 (E.D. Ky. Dec. 30, 2022) ("While Progressive is not expressly required to research how the PSA is calculated in its insurance policy, its commitment to pay the ACV of a total-loss vehicle carries

15

the implied promise that the defendant ensure that its calculations reflect market realities."). It cannot be disputed that if this failure violates the covenant of good faith and fair dealing, it does so as to all members of the Class.

Progressive's lack of good faith is illustrated by the same common proof applicable to the breach element of Plaintiff's breach of contract claim. *See Clippinger*, 2022 WL 17592417, at *8 ("The Court explained above that there is a triable issue of fact about whether Plaintiff can prove the breach and damages elements of her breach of contract claim. And Plaintiff's supporting evidence of these elements could also persuade a reasonable jury that Defendant failed to act in good faith under the Policy.").

### 3. Plaintiff's damages model fits her theory of liability, and any individual issues of damages cannot predominate over common issues of liability.

The measure of damages is the amount of the PSA deduction—calculated as the total amount of the PSA deductions, divided by the number of comparable vehicles utilized—plus sales tax and prejudgment interest. Lacey Report at 12-13. Plaintiff's theory on the merits is that, because an honest look at vast empirical data, consistent with expert testimony from those with knowledge of how the used auto market works, confirms that vehicles typically sell for their advertised price, and because any adjustments to the price of comparable vehicles must be based on verified information, not foregone conclusions, the listed price of comparable vehicles adjusted for differences in mileage, options, and condition (which Progressive imposes and Plaintiff does not challenge), constitutes the actual cash market value of an insured vehicle. If a jury agrees, damages are a ministerial calculation: the difference between actual market value and the artificially deflated value after imposition of the PSA deductions. Merritt Rep. at 7-8; Lacey Rep. at 12-13; *see also* Newberg on Class Actions § 12:2 ("a common method for showing individual

16

damages—a simple formula could be applied to each class member's … records—[is] sufficient for the predominance [] requirement[] to be met.").

This damages model is consistent with Plaintiff's theory of liability. Other than the application of the PSA, Plaintiff agrees with how market value was calculated by Mitchell, i.e., the "comp" method. *See* Merritt Rep. at 7. Numerous cases across the country—including in the more complicated context of real-property disputes—have been certified as class actions where plaintiffs put on proof that one step in a multistep appraisal process is improper and proposed a damages model of excising the offending portion of the valuation.

Instructive here is *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408 (5th Cir. 2017). There, like here, the plaintiffs contested Progressive's calculation of the base market value. *Id*. at 411 ("Plaintiffs' liability theory is that Defendant unlawfully used [WCTL] to calculate the base value of total loss vehicles."). Like here, the plaintiff did ***not*** contest condition adjustments to the base value. *Id*. The court found the theory of liability and damages matched:

> Plaintiffs' damages theory aligns with that liability theory. By essentially rerunning Defendant's calculation of ACV but with a lawful base value, Plaintiffs' damages theory only pays damages resulting from the allegedly unlawful base value. Because this condition adjustment is a separate and unrelated step from the calculation of base value, *there is no principled reason why Defendant's own condition adjustment scores could not be used* to adjust base values derived from NADA or KBB.

*Id*. (cleaned up and emphasis added). The only distinction here is one without a difference: Rather than scrapping the base value calculation wholesale and using NADA in its place, Plaintiff's proof will show the proper base value is identified by removing the PSA deduction, and then, as in *Slade*, the condition adjustments are properly applied to the proper base value. *See also*, *Clippinger*, 2022 WL 17592417, at *6 (noting "the three appraisers here did not apply a typical negotiation

17

deduction to Plaintiff's total loss vehicle," which "tends to show such a deduction is not within the definition of 'actual cash value'" under Tennessee's total-loss regulation).

Lower courts applying *Slade* also had little difficulty certifying claims challenging a single problem with an ACV determination and putting on proof on how to fix that problem, while keeping the non-offending portions. *Shields v. State Farm Mutual Automobile Insurance Co.*, Case No. 6:19-cv-1359, 2022 WL 37347, at *8 (W.D. La. Jan. 3, 2022); *Sampson v. United Services Automobile Association*, Case No. 6:19-cv-896, 2022 WL 1415652, at *8 (W.D. La. May 3, 2022). Another example: In *Lewis v. Gov't Emples. Ins. Co.*, where the plaintiff contested a discrete adjustment, the court found class treatment proper to resolve the validity of that adjustment. Civil No. 18-5111 (RBK/MJS), 2022 WL 819611 (D.N.J. Mar. 18, 2022). Likewise, in the real-property context, the Fifth, Sixth, and Eighth Circuits affirmed certification where plaintiffs challenge one component of an ACV calculation, and their damages model was to excise the offending adjustment and accept the remainder of the insurer's valuation. *See Hicks v. State Farm*, 965 F.3d 452, 460–61 (6th Cir. 2020); *Mitchell v. State Farm*, 954 F.3d 700, 710–711 (5th Cir. 2020); *Stuart v. State Farm*, 910 F.3d 371, 375–76 (8th Cir. 2019).

As these three Circuit courts noted, this principle is true even where insurers argue there may have been an **over**payment as to some other unchallenged aspect of the ACV calculation. In *Hicks*, like the other two cases, the single aspect of the ACV calculation challenged by the plaintiff was depreciation of labor costs. 965 F.3d at 456. State Farm argued certification was inappropriate because even if it were not permitted to depreciate labor, "it may have miscalculated ACV payments based on individualized errors unrelated to depreciating labor costs" and this undercalculation may have even exceeded the depreciation amount. *Id.* at 460. "Put another way, State Farm intends to defend against the claims of individual class members by proving that some

18

insureds were not damaged because it either overestimated ACV payments to such a degree that the deduction of labor depreciation resulted in no damages or it mistakenly reimbursed labor depreciation costs to RCV claimants for more than they were owed." *Id.* The Sixth Circuit rejected this argument because "'any overestimation [] simply operates as an error in the insured's benefit.'" *Id.* at 461 (quoting *Stuart,* 910 F.3d at 376-77)*.* And even if "this sub-issue were to become relevant at the merits stage," it might be resolvable through subclasses or bifurcation*. Id.* at 462. Likewise, in *Mitchell*, the Fifth Circuit stressed that "whether State Farm made an error in estimating" other elements of the ACV calculation "is a question separate from this class litigation" and left it to the district court to determine "how to handle sub-issues that may or may not arise in granting class relief." 954 F.3d at 711. Finally, in *Stuart*, the Eighth Circuit held: "[T]he only dispute is over including labor depreciation in the calculation, which is a discrete portion of the formula that is easily segregated and quantified." 910 F.3d at 376.

Here, the critical issue is whether Progressive's application of the PSA means it was not considering market value and was instead paying an artificially deflated value. *See Smith*, 18 F.4th at 980-81; *Clippinger*, 2022 WL 17592417, at *6. If so, the clear remedy – just as in the numerous cases discussed above – is awarding damages calculated by backing out the invalid PSA deduction from the Mitchell reports. But even if the jury rejects such measure of damages, class certification is appropriate—at that point, this Court would possess a number of options, including notifying Class Members that the jury determined Progressive breached its contract by failing to consider market value, but that each Class member may need to take additional steps to establish their individual damages amount. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001).

In sum, Plaintiff's claims are "sufficiently cohesive to warrant adjudication by representation." *Beattie*, 511 F.3d at 564 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 632 (1997)).

## C. THE REMAINING RULE 23(a) PREREQUISITES ARE MET

### 1. The Class is numerous such that joinder is impracticable.

Fed. R. Civ. P. 23(a)(1) requires that the proposed Class be so numerous that joinder is impracticable. There is no strict numerical test to satisfy this requirement, but "'substantial' numbers usually satisfy the numerosity requirement." *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006). Progressive produced claims data for the putative Class showing ███████ ████████████████████████. Lacey Rep. at 12. This easily satisfies Rule 23(a)(1).

### 2. Plaintiffs are typical of, and will adequately represent, the Class.

Under Rule 23(a)(3), typicality is established where the plaintiff's claim arises from the same events giving rise to the class members' claims, and those claims are based on the same legal theory. *Owner Operator Independent Drivers Assoc., Inc. v. Arctic Express, Inc.*, No. 2:97-cv-750, 2001 WL 34366624, at *6 (S.D. Ohio Sept. 4, 2001) (quoting *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996)). However, "[t]he claims of the named plaintiff[] and the absent members must be typical, not identical or homogeneous." *Jenkins v. Hyundai Motor Financing Co.*, No. C2-04-720, 2008 WL 781862, at *5 (S.D. Ohio Mar. 24, 2008). Typicality is met so long as there is a common element, such that the court "may properly attribute a collective nature to the challenged conduct." *Beattie*, 511 F.3d at 561 (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (en banc)); *see also Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2021 U.S. Dist. LEXIS 87324, at *36 (E.D. Tenn. May 7, 2021) (noting that typicality sets forth a "low burden").

20

Progressive's practices are uniform. It is undisputed that the form Policies contain identical language, and that Progressive applied a PSA to the listed price of comparable vehicles for every Class Member, which is the practice that gave rise the claim. *see* Lacey Rep. at 9-12 and Exhibit 4 thereto. This case will turn on whether this uniform practice is authorized by the plain language of the Policy. The claims arise from the same challenged conduct and share the same essential characteristics. *See In re Whirpool*, 722 F.3d at 853-54 (typicality established where claims were based on same alleged product defects and lack of adequate warnings, notwithstanding that the class period covered twenty-one different models as "the common question of whether design defects cause mold growth remains across the manufacturing spectrum Whirlpool describes.").

Plaintiff also satisfies the Rule 23(a)(4) adequacy requirement. Adequacy requires the court to consider two criteria: (1) whether the representative has common interests with the proposed class members; and (2) whether the representative will vigorously prosecute class's interests through qualified counsel. *Gilkey v. Central Clearing Co.*, 202 F.R.D. 515, 525 (6th Cir. 2001). The "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Coulter-Owens v. Rodale, Inc.*, Case No. 2:14-cv-12688, 2016 WL 8224304, at *2 (E.D. Mich. May 3, 2016) (quotation omitted). Plaintiff has presented no claims that would be detrimental to the class interests, and all Class members would benefit from a finding that the PSA is improper and constitutes a breach.

The second adequacy prong asks whether "the representatives will vigorously prosecute the interests of the class through qualified counsel." *Intercommunity Justice and Peace Center v. Registrar, Ohio Bureau of Motor Vehicles*, 440 F. Supp. 3d 877, 891 (S.D. Ohio 2020). Plaintiffs have retained qualified counsel with experience litigating class action cases and are committed to

expending the resources to prosecute this claim. Ex. 11 ("Bates Decl.") at ¶¶ 2-4. Both Rule 23(a)(4) and Rule 23(g) are satisfied. *See* Fed. R. Civ. P. 23(g)(1).

## D. CLASS TREATMENT IS SUPERIOR

Factors relevant to determining whether class treatment is superior to other forms of adjudication are: (A) any interest in individually controlling prosecution; (B) whether any litigation has already commenced; (C) the desirability of concentrating litigation; and (D) manageability. Fed. R. Civ. P. 23(b)(3).

Here, Plaintiff Taylor's PSA damages are $485.86. Lacey Rep. at 12. This is relatively small compared to the cost of litigating against a large insurance company. In *Amchem*, the Supreme Court noted that the central policy underlying the class action mechanism is "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). The Sixth Circuit has held that small possible recoveries by affected individuals make a class action the superior mechanism for adjudicating disputes. *Beattie*, 511 F.3d at 567. Plaintiff is unaware of any other litigation in Tennessee against Progressive raising these claims—and even if there were, it would nevertheless be "desirable to concentrate litigation on these claims into one court and in one action for purposes of efficiency and judicial economy." *Violette v. P. A. Days, Inc.*, 214 F.R.D. 207, 220 (S.D. Oh. 2003).

Finally, class treatment is manageable. Liability will be established through common evidence of Mountain Laurel's uniform Policy provisions and method for valuing total loss claims. Even if management was likely to be difficult—and to be clear, it will not be—the comparison is to individual litigation, not to no litigation at all. *See Bechtel v. Fitness Equipment Services, LLC*, 339 F.R.D. 462, 485 (S.D. Ohio 2021). For this reason, manageability concerns "will rarely, if

ever, be in itself sufficient to prevent certification of a class." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1272 (11th Cir. 2004). To be sure, class treatment is more manageable than ██████ + individual cases, which is why "economies of time, effort, and expense" coupled with a focus on "uniformity of decision[s] as to persons similarly situated," is the main manageability concern. *Martin v. Behr Dayton Thermal Prod. LLC,* 896 F.3d 405, 415 (6th Cir. 2018). Here, there are no manageability concerns—identifying Class members is formulaic and based on objective, verifiable data in Progressive's records. Lacey Rep. at 9-12.

Accordingly, classwide adjudication is the superior method for resolving this dispute.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion should be granted.

Dated November 10, 2023                                 Respectfully submitted,

                                                                        */s/ Jake Phillips*

                                                                        Jacob L. Phillips (admitted *pro hac vice*)
                                                                        **NORMAND PLLC**
                                                                        3165 McCrory Place, Ste. 175
                                                                        Orlando, FL 32803
                                                                        Phone: (407) 603-6031
                                                                        Fax: (888) 974-2175
                                                                        Email: jacob.phillips@normandpllc.com

                                                                        Hank Bates (admitted *pro hac vice*)
                                                                        Lee Lowther (admitted *pro hac vice*)
                                                                        **CARNEY BATES & PULLIAM,
                                                                        PLLC** 519 W. 7th Street
                                                                        Little Rock, Arkansas 72201
                                                                        Phone: (501) 312-8500
                                                                        Fax: (501) 312-8505
                                                                        Email: hbates@cbplaw.com
                                                                        Email: llowther @cpblaw.com

23

**J. Gerard Stranch, IV**
**Branstetter, Stranch & Jennings, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Phone: (615) 254-8801
Fax: (615) 250-3937
Email: gerards@bsjfirm.com

Scott Edelsberg (admitted *pro hac vice*)
Christopher Gold (admitted *pro hac vice*)
**Edelsberg Law, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Phone: (786) 289-9471
Fax: (786) 623-0915
Email: scott@edelsberglaw.com
Email: chris@edelsberglaw.com

Andrew J. Shamis (admitted *pro hac vice*)
**Shamis & Gentile, P.A.**
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Phone: (305) 479-2299
Email: ashamis@shamisgentile.com

*Counsel for Plaintiff and the Proposed Class*

24

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 10, 2023, a true and correct copy of the foregoing was served through the Court's CM/ECF system.

_/s/ Jake Phillips_____

Jacob L. Phillips (admitted _pro hac vice_)
