UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| TAYLOR COSTELLO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | 2:22-CV-35 |
| MOUNTAIN LAUREL ASSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND REPORT AND RECOMMENDATION

Plaintiff has filed a Motion to Certify Class [Docs. 137, 138].[1] Defendant filed a Response

in Opposition [Doc. 141, 142],[2] to which Plaintiff filed a Reply [Doc. 139].[3] Defendant also filed

Motions to Exclude the reports and testimony of Jeffrey Martin, Kirk Felix, and Jason Merritt

[Docs. 135, 136], to which Plaintiff filed Responses in Opposition [Doc. 143, 144].[4] Defendant

then filed a Reply [Doc. 146].[5] These motions are before the undersigned pursuant to 28 U.S.C. §

636(b) and are now ripe for resolution. For the reasons stated below, the undersigned **ORDERS**

as follows regarding Defendant's Motion to Exclude reports and testimony: 1) it is **DENIED**

---

[1] This case is one of many similar actions pending in districts across the country. As such, and through no fault of counsel, the record in this case is voluminous and contains numerous sealed entries. To assist both the Court and counsel in addressing such a voluminous, and often confusing, record, the Court directed the parties to file updated versions of their motions and briefs relative to class certification and *Daubert* issues containing tables of authorities and streamlined exhibits. *See* [Doc. 129]. For simplicity, the Court will cite to the updated versions of the motions and briefs. The original redacted Motion to Certify Class can be located at Doc. 67, with the original sealed unredacted version being Doc. 71.
[2] Doc. 78 is the original redacted Response and Doc. 84 is the sealed unredacted version.
[3] Doc. 91 is the original Reply.
[4] Defendant originally filed three separate motions, which were all combined into one revised motion per the Court's instruction. Doc. 72 is the original motion for Martin, Doc. 73 is the original motion for Felix, and Doc. 76 is the original motion for Merritt. Plaintiff's original responses can be found at Docs. 87 and 119 for Martin, Doc. 85 for Felix, and Docs. 89 and 95 for Merritt.
[5] Defendant's original replies can be found at Doc. 103 for Martin, Doc. 104 for Felix, and Docs. 102 and 109 for Merritt.

**without prejudice** as premature as to Jeffrey Martin; 2) it is **GRANTED in part** and **DENIED in part**, as specifically set forth herein, as to Kirk Felix; and 3) it is **DENIED** as to Jason Merritt. Additionally, for the reasons set forth below, the Court **RECOMMENDS** that Plaintiff's Motion to Certify Class be **GRANTED**.

## I.    BACKGROUND

On March 25, 2021, Plaintiff Taylor Costello ("Plaintiff") was involved in a car accident in which her vehicle was damaged. [Doc. 29, ¶ 16]. At the time of the accident, Plaintiff's vehicle was insured under a policy (the "Policy") issued by Defendant Mountain Laurel Assurance Company[6] ("Defendant"). *Id.* at ¶¶ 2, 16; [Doc. 29-1]. After the accident, Plaintiff filed a damage claim with Defendant. [Doc. 29, ¶ 17]. Defendant ultimately declared Plaintiff's vehicle a total loss and purported to pay her the actual cash value ("ACV") for her vehicle as required by the terms of the Policy. *Id.* at ¶ 18. Defendant determines the amount of its total-loss claims payments by employing a "total loss settlement process." *Id.* at ¶ 19. The Court will first outline Defendant's valuation process for context and then address the relevant procedural history.

### a. Defendant's Valuation Process

To determine the pre-loss ACV of an insured's vehicle, Defendant uses a software program called WorkCenter Total Loss ("WCTL") that was jointly developed by Mitchell International, Inc. ("Mitchell") and J.D. Power & Associates ("J.D. Power"). [Doc. 142, p. 7].[7] That program produces a report for each total loss vehicle, which contains a description of how the vehicle's ACV is calculated. [Doc. 141-21, p. 9]. As a first step, WCTL generates a "base value" for the total loss vehicle by identifying between 3 and 20 comparable vehicles that were

---

[6] Defendant is a subsidiary of Progressive Corporation. [Doc. 17].
[7] Page number citations refer to the ECF-assigned page number as opposed to the page number included in the original pleading as there are sometimes disparities between the two.

recently sold or are listed for sale in the insured's local market. [Doc. 142, p. 10-11]. WCTL then individually adjusts the price of the identified comparable vehicles to account for differences between each of them and the insured's vehicle, such as mileage, equipment, and optional features. *Id.* at p. 11; [Doc. 141-21, p. 6-8]. If WCTL has identified a sold price for a comparable vehicle[8] or if a comparable vehicle is listed for sale at a no-haggle dealership,[9] no further adjustments are made. [Doc. 142, p. 11]. However, for all other vehicles, WCTL applies a Projected Sold Adjustment ("PSA") to account for what they claim will be the likely sale price based on consumer negotiation behavior. *Id.* All the adjustments to the comparable vehicles "are made for one attribute at a time and calculated independently." [Doc. 142-4, p. 4]. The report generated reflects that each adjustment made to a comparable vehicle stands on its own so that changing one will not impact the other. [Doc. 141-21, p. 6-8; Doc. 142-4, p. 4]. In other words, removing the PSA will have no effect on the mileage or equipment adjustments, just as removing a mileage or an equipment adjustment would have no impact on the PSA. *See* [Doc. 142-4, p. 4; Doc. 141-21, p. 6-8].

After each comparable vehicle has been individually adjusted in the manner set forth above, these adjusted comparable vehicle values are averaged to determine the base value of the insured's vehicle. [Doc. 142, p. 11]. After the base value is determined, WCTL then adjusts the base value according to the totaled vehicle's condition. *Id.* The condition is assessed by inspecting the vehicle and rating 13 components of its condition on a scale of 1-5 in increments of .01. *Id.*;

---

[8] If the sold price for any given vehicle is above list price, even by one cent, that vehicle's price is automatically discarded as an outlier. [Doc. 145, p. 25]. Further, prior to July 2021, any vehicle whose sale price was equal to its list price was automatically discarded as an outlier as well. *Id.* at p. 12-14.

[9] While Defendant has stated that no PSA is applied to the list price of vehicles for sale at no-haggle dealerships, such as CarMax, it appears from the record that sales from such no-haggle dealerships may be excluded from the J.D. Power data altogether. *See* [Doc. 145, p. 25]. However, the Court notes that determining whether vehicles listed or sold by no-haggle dealerships were included in the list of comparable vehicles considered is unnecessary for purposes of addressing *Daubert* and class certification issues.

[Doc. 141-21, p. 5; Doc. 136-1, p. 4]. The number assigned to the 13 components is then averaged and listed as the overall condition. That number is used to calculate the percentage condition adjustment, if any, that will be applied to the base value. [Doc. 142-4, p. 8]. Condition ratings can result in either upward or downward adjustments to the base value of the total loss vehicle. [Doc. 142, p. 11; Doc. 142-1, p. 4; Doc. 141-21, p. 4-5]. In addition to the condition adjustment, adjustments for after-market/original equipment manufacturer ("OEM") parts and a title history adjustment would be made at this stage, if they are applicable. [Doc. 142-2, p. 6; Doc. 141-21, p. 5]. The adjustments for after-market/original equipment manufacturer parts are assessed independently of one another and of the condition adjustment. [Doc. 141-21, p. 2, 5]. According to Defendant's process, applying the condition, OEM parts, and title adjustments to the calculated base value yields the appropriate ACV for the totaled vehicle.

It is the application of the PSA to the comparable vehicles that is in controversy here. While as noted above, a PSA is not universally applied to a comparable vehicle, anytime one is applied it lowers the value of the comparable vehicle which, in turn, lowers the ACV of the total loss vehicle. Plaintiff argues that a PSA should never be applied because unlike in times past, dealers generally no longer negotiate after establishing the list price for a vehicle, resulting in vehicles generally selling for their list price. [Doc. 29, ¶ 8]. To support this contention, Plaintiff explains that the prevalence of internet shopping and the existence of sophisticated pricing software has changed the way dealers price vehicles. [Doc. 138, p. 3]. According to Plaintiff, car dealerships now "price vehicles to market," meaning the listed price reflects the actual cash value of the vehicle because consumers can compare prices online and will not do business with a dealership with higher advertised prices. *Id.*

On the other hand, Defendant argues that vehicles regularly sell for below list price and

asserts that the PSA is calculated based on actual transaction data that J.D. Power obtains through "its expansive dealer network." [Doc. 142, p. 7, 13]. In response, Plaintiff argues that Defendant and its vendors manipulate the data used to calculate the PSA by excluding from the dataset every transaction in which a used vehicle sold for above the internet list price and, prior to July 2021, every transaction in which the sale price of a used vehicle was equal to its list price in addition to those selling for above list price. [Doc. 138, p. 3-4]. Simply put, Plaintiff avers that Defendant discarded all data that did not support a reduction in sale price. *Id.* at p. 4. Defendant classifies sales reflected as being made at or above the list price as "outlier transactions" and admits they are removed from the data. [Doc. 142, p. 14]. Defendant claims it removes these transactions to ensure accuracy, claiming that when transaction data reflects that the sold price for a vehicle is higher than the list price, it is likely due to a data entry error rather than because the vehicle did in fact sell for at or more than its list price. *Id.*

In sum, Plaintiff objects to Defendant's application of a PSA during the valuation process, claiming that by applying it the company breaches its contract with insureds because it fails to compensate those insureds for their total loss vehicle's ACV. Plaintiff does not take issue with any other aspect of the methodology Defendant uses to calculate a vehicle's ACV.

## II.   PROCEDURAL HISTORY

Plaintiff initially filed a class action complaint against Defendant on April 7, 2022. [Doc. 1]. In lieu of an answer, Defendant filed a Motion to Dismiss for failure to state a claim for breach of contract, alleging Plaintiff's complaint failed to identify any particular provision of her insurance Policy that Defendant breached, and Plaintiff had failed to allege the facts necessary to demonstrate a breach. [Doc. 26]. In response, Plaintiff filed an Amended Class Action Complaint (the "Amended Complaint"). [Doc. 29]. In the Amended Complaint, Plaintiff asserted causes of

action for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory judgment. *Id.* at ¶¶ 58–77. Plaintiff claims that she and each member of the proposed class were damaged when Defendant applied a PSA in valuing their total loss vehicles because that application resulted in insureds receiving less than the ACV for their vehicles. *Id.* at ¶ 48. Individually, Plaintiff contends that if the PSA had not been applied to the valuation of her vehicle, she would have received $485.86 more for her totaled vehicle, exclusive of any increase for applicable taxes. *Id.* at ¶ 49. Defendant then filed a Motion to Dismiss Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). [Doc. 30]. The District Court granted Defendant's motion to dismiss as to Plaintiff's request for declaratory judgment but denied the motion as to Plaintiff's claims for breach of contract and breach of the covenant of good faith and fair dealing, finding that Plaintiff had stated a colorable claim for breach of contract and, as a result, has also stated a colorable claim for breach of the covenant of good faith and fair dealing. [Doc. 56, p. 24, 26].

Plaintiff has now filed a Motion to Certify Class [Doc. 138] seeking to certify a class under Federal Rule of Civil Procedure 23, which Defendant opposes [Doc. 142]. Plaintiff defines the proposed class as:

> All persons who made a first-party claim on a policy of insurance issued by Mountain Laurel Assurance Company to a Tennessee resident who, from April 7, 2016, through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell (i.e. Report code = "COMP") and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

In addition to opposing class certification, Defendants have also moved to exclude Plaintiff's experts, Jeffrey Martin, Kirk Felix, and Jason Merritt. [Doc. 135]. Plaintiff opposes Defendant's request to exclude the testimony of these experts. [Doc. 144]. On November 30, 2023, the

undersigned heard oral argument as to Plaintiff's Motion to Certify Class and Defendant's motions to exclude experts. [Doc. 129]. The Court will now address each motion in turn.

## III.  *DAUBERT* MOTIONS

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court stated that evidence proffered under Rule 702 must be relevant *and* reliable, considering "whether the reasoning or methodology underlying the testimony is scientifically valid." 509 U.S. 579, 593-94 (1993). *Kumho Tire Co. v. Carmichael* clarified that the "gatekeeping" criteria set out in *Daubert* applies to all expert testimony, whether that testimony involves scientific, technical, or other specialized knowledge. 526 U.S. 137, 147 (1999). Rule 702 affords the courts "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *United States v. Simpson*, 845 F. App'x 403, 409 (6th Cir. 2021) (quoting *Kumho Tire*, 526 U.S. at 152). The Sixth Circuit has instructed that Rule 702 analysis should be performed in three steps. *Id.* "First, the witness must be qualified by knowledge, skill, experience, training, or education. Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or determine a fact in issue. Third, the testimony must be reliable." *Id.*

(citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008); Fed. R. Evid. 702)) (internal citations omitted).

The Court notes that Rule 702 was recently amended "to clarify and emphasize that the expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 Advisory Committee's note to 2023 amendments. "Rule 702(d) has also been amended to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.* At the same time, the Court recognizes that these amendments were intended to clarify the requirements of the Rule, not to make substantive changes. *See id.*

While the clarification provided by the recent amendments to Rule 702 may result in some change to the *Daubert* analysis regarding expert witnesses, neither the Supreme Court nor the Sixth Circuit has clearly stated "whether a district court must undertake a full *Daubert* analysis at the class-certification stage when an expert's report is critical to the class certification analysis." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 465 (6th Cir. 2020); *see also Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 2:20-CV-02482-TLP-cgc, 2023 WL 7213796, at *5 (W.D. Tenn. Aug. 25, 2023). "The issue is beguiling for the simple reason that certification is generally not the time to decide the merits of the case, yet expert witness testimony relevant to the merits is often proffered as also relevant to a prong of the certification inquiry." 3 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 7:24 (6th ed. 2023). In the absence of clear direction from the Supreme Court, two different approaches to this issue have developed. *Id.* The Seventh, Ninth, and Eleventh Circuits have adopted the "full *Daubert*" approach, requiring a full *Daubert* analysis at the class certification stage. *Id.* (citing *Messner v. Northshore Univ. HealthSystem*, 669

F.3d 802, 812-23 (7th Cir. 2012); *Sher v. Raytheon Co.*, 419 F. App'x 887 (11th Cir. 2011); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011); *Am. Honda Motor Co. v. Allen*, 600 F.3d 813 (7th Cir. 2010)). On the other hand, the Third and Eighth Circuits have adopted a "limited *Daubert*" approach at the class certification stage. *Id.* (citing *Behrend v. Comcast Corp.*, 655 F.3d 182 (3rd Cir. 2011); *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604 (8th Cir. 2011)). While the Sixth Circuit has yet to formally adopt either of these approaches, caselaw suggests that the limited *Daubert* approach is favored. *Id.*; *see also Hicks*, 965 F.3d at 465 (noting that the Sixth Circuit has "yet to settle" whether a full *Daubert* analysis is required at the class certification stage); *Clippinger*, 2023 WL 7213796, at *5 (noting the Sixth Circuit's silence on the issue of *Daubert* analysis at the class certification stage and, with that in mind, opting to address expert admissibility "only as necessary to resolve the class certification motion."); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F. Supp. 687, 692 (E.D. Mich. 2019) (finding it appropriate to conduct a *Daubert* analysis at the class certification stage while also keeping in mind that "the challenged testimony is not being offered to prove the merits of the plaintiff's claims, but only to establish that the merits of those claims can properly be adjudicated by means of collective litigation.").[10] With this in mind, the Court will address Defendant's *Daubert* motions "only as necessary to resolve the class certification motion." *Clippinger*, 2023 WL 7213796, at *5.

### a. Whether Challenged Experts Are Critical to Class Certification

Plaintiff asserts that the opinions of Kirk Felix ("Felix") and Jeffrey Martin ("Martin") pertain to the merits of the case and are not critical to class certification and, as such, asserts that

---

[10] Defendant argues that district courts within the Sixth Circuit routinely conduct *Daubert* analyses at the class certification stage when the motion or opposition relies on a challenged expert's testimony even if those opinions primarily relate to the merits and asks the Court to do so here. [Doc. 146, p. 1]. While Defendant is correct that district courts have sometimes conducted full *Daubert* analyses at the class certification stage, this is not always the case.

Defendant's motions to exclude Felix and Martin are premature.[11] [Doc. 144, p. 11]. On the other hand, Defendant argues that Felix and Martin's opinions are critical to the issue of class certification. [Doc. 146, p. 3]. As to Felix, Defendant claims that his opinion is the primary support for Plaintiff's argument that the data underlying the PSA is inconsistent with the modern used car market. *Id.* Additionally, Defendant argues that Plaintiff "extensively relies upon Martin's report to support her theory that the PSA is improper because vehicles typically sell for more than list price." *Id.*

At its core, Felix's report opines that in the current used car market, dealers list cars at the price for which they expect the car to sell due to consumers' propensity to use the internet to compare vehicle prices before ever going to a dealership. [Doc. 143-4, p. 3]. He goes on to say that this change has resulted in market price and list price generally being the same. Because Defendant contends that market price is generally lower than list price and justified application of the PSA, this opinion offered by Felix to the contrary is central to Plaintiff's overall argument that in applying the PSA, Defendant breached its contract with insureds. As a result, the Court finds that Felix's opinion is critical to resolving the issue of class certification.

Martin is a statistician and data analyst who is expected to testify that, based on the data provided to him by Plaintiff which he analyzed, the median sold-to-list ratio ("S/L ratio") is 1.0, meaning that vehicles sold for 100% of their list price. [Doc. 144, p. 9-10; Doc. 135-22, p. 6]. Martin's opinions are essentially provided as further support for Felix's opinion that it is common for used vehicles to sell for list price. *See* [Doc. 138, p. 10]. Given that Martin's opinion is designed to add to the opinions provided by Merritt and Felix rather than stand alone, the court does not find

---

[11] There is no dispute that the report and testimony of Jason Merritt is critical to the issue of class certification. As such, the Court will only address whether the opinions of Felix and Martin are critical to the issue of class certification.

Martin's report critical to its class certification analysis.[12] Accordingly, the Court will address Defendant's motions to exclude Felix and Merritt as necessary to resolve the issue of class certification, and Defendant's motion to exclude Jeffrey Martin is **DENIED without prejudice as premature**.[13]

### b. Jason Merritt

Jason Merritt ("Merritt") is expected to opine that Defendant's use of the PSA is not appropriate when determining ACV based on the comparable "comp" methodology[14] and that an accurate ACV can be determined by simply removing the PSA adjustment from the Mitchell report of each total-loss vehicle.[15] [Doc. 144, p. 7]. Defendant first argues that the opinions of Merritt are not reliable because they are not based on any specific methodology, accepted principles, or concrete data. [Doc. 136, p. 8]. More specifically, Defendant contends the Court should disregard Merritt's opinion that the application of the PSA is inconsistent with appraisal standards because it is not based upon any industry sources or specific data, and instead is founded only upon Merritt's personal experience as an appraiser. *Id.* Additionally, Defendant takes issue with

---

[12] In *Volino v. Progressive Casualty Ins. Co.*, No. 21 Civ. 6243 (LGS), 2023 WL 2532836 (S.D.N.Y. Mar. 16, 2023), the court was presented with facts and parties nearly identical to those present in the case at hand. There, the court found it appropriate to grant class certification based upon the opinions of Felix and Merritt, and neither Martin nor anyone else offering similar testimony was proffered as an expert during the certification process. Additionally, in *Clippinger*, 2023 WL 7213796, the Western District of Tennessee recently addressed whether class certification was appropriate in a case where the scenario was essentially identical to the facts of this case. There, an insured asserted that an insurance company breached its contract with insureds by applying a "typical negotiation adjustment" to the price of comparable vehicles which were in turn used to determine the market value of an insured's total-loss vehicle. Like *Volino*, the *Clippinger* court fully considered and granted the plaintiff's motion for class certification based upon the opinions of Felix and Merritt, without the benefit of expert testimony of the type Martin would offer. *Id.*

[13] The Court notes that the deadline for filing *Daubert* challenges has not yet passed, and Defendant is free to re-file a motion to exclude Martin's report and testimony after the issue of class certification has been addressed by the District Court. *See* [Docs. 34, 151].

[14] Merritt's report explains that the comp methodology is commonly used for conducting automobile appraisals. [Doc. 143-2, p. 3]. This method "involves finding vehicles for sale, or recently sold, within a certain geographic area that are similar, or 'comparable,' to the vehicle being valued…Once the comps are chosen, differences in observed and verifiable features (such as options, mileage, trim level, and condition) between the loss vehicle and the comps are documented…[and] result in price adjustments from the list price of the comparable vehicles." *Id.* at p. 3-4.

[15] Merritt's opinions also include an explanation of what an appraisal is and how to use the comp methodology to determine a vehicle's ACV, and Defendant does not appear to object to his opinions as to these matters.

Merritt's opinion that removal of only the PSA from the Mitchell valuation reports will yield an accurate ACV, asserting that the opinion is unreliable and not helpful to the trier of fact. *Id.* at p. 10. Defendant argues that Merritt's opinion on this point is based on nothing more than speculation and contends that Merritt has done no work to verify or understand the other aspects of Defendant's appraisal process. *Id.* at p. 10-11.

In response, Plaintiff notes that four courts have previously analyzed this issue and determined that Merritt's testimony is reliable and would be helpful to a jury, asserting that the same is true in this case. [Doc. 144, p. 14] (citing *Drummond v. Progressive Specialty Ins. Co.*, No. 21-4479, 2023 WL 5181596, at *6 (E.D. Penn. Aug. 11, 2023); *Clippinger*, 2023 WL 7213796, at *5; *Brown v. Progressive Mountain Ins. Co.*, No. 3:21-cv-175-TCB, Doc. 124, pp. 19-20 (N.D. Ga. Aug. 3, 2023); *Volino v. Progressive Cas. Ins. Co.*, No. 21 CIV. 6243 (LGS), 2023 WL 2532836, at *4 (S.D.N.Y. Mar. 16, 2023)). While Defendant acknowledges that Merritt's testimony was permitted in these cases, it notes that Merritt has provided additional deposition testimony that these courts did not have when they permitted Merritt to testify. In further response to Defendant's request to exclude Merritt, Plaintiff points out that Merritt has significant experience with vehicle appraisals and is permitted to rely solely on that experience in rendering an expert opinion. *Id.*

In determining the admissibility of Merritt's opinion evidence, the Court must first determine whether Merritt is qualified as an expert based on his "knowledge, skill, experience, training, or education." *Simpson*, 845 F. App'x at 409. Merritt's experience in the auto industry dates back more than 40 years when he was certified to perform detailed vehicle safety inspections for the state of Maryland. [Doc. 143-2, p. 12]. During his career with the Maryland State Police, part of his duties involved acquiring and maintaining vehicles. *Id.* at p. 2. From 2016-2019, Merritt

worked for Timbrook Automotive and during his time there conducted several hundred vehicle appraisals to determine the fair market value of the vehicles. *Id.* at p. 3, 13. In 2020, Merritt opened East Coast Auto Appraisers, LLC and became a certified auto appraiser through the Board of Certified Auto Appraisers. *Id.* at p. 14. Merritt estimates that during his career he has conducted more than a thousand appraisals to determine ACV, hundreds of which were on total-loss vehicles. *Id.* at p. 2. Just as other courts have, this Court finds that Merritt's experience qualifies him to opine regarding how appraisals are generally conducted, including whether a PSA is typically applied. *See Drummond*, 2023 WL 5181596, at *6; *Clippinger*, 2023 WL 7213796, at *5; *Brown*, No. 3:21-cv-175-TCB, Doc. 124, at p. 19-20; *Volino*, 2023 WL 2532836, at *4. Further, the Court finds that because Merritt is qualified to opine that a PSA-like adjustment would not normally be applied in an appraisal, he is likewise qualified to opine that Mitchell's valuation process is in keeping with the comp appraisal methodology aside from the application of the PSA, such that removal of the PSA from Mitchell reports would yield an accurate ACV. *See Volino*, 2023 WL 2532836, at *4; *see also* [Doc. 143-2, p. 4-5] (explaining that Merritt had reviewed Mitchell's valuation report and found it consistent with comp methodology except that "Mitchell deviated from the comp methodology, however, by applying downward adjustments to the Internet prices of the specific comparable vehicles advertised for sale.").

The Court also finds that Merritt's opinions are reliable. The fact that Merritt relies primarily on his experience instead of utilizing any formalized methodology or data does not render his opinions unreliable. Rule 702 permits an expert witness to rely solely on experience. *See* Fed. R. Evid. 702 Advisory Committee's note to 2000 amendments (observing that "[n]othing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training, or education—may not provide a sufficient foundation for expert

testimony."); *see also Clippinger*, 2023 WL 7213796, at *5 (finding "Merritt's personal knowledge and experience as an appraiser can serve as the basis of his reliable testimony."). Further, Merritt has formal training in the field of car appraisals as he is a board-certified appraiser.

Defendant has made much of Merritt's lack of knowledge regarding the methodology Mitchell uses in applying the PSA and calculating ACV, essentially arguing that if Merritt does not know exactly how the methodology works then he cannot reliably opine that removal of the PSA would render an accurate ACV. Merritt's opinion is that a proper appraisal based on the comp methodology would apply all the adjustments that Mitchell applies in its valuation reports aside from the PSA. *See* [Doc. 135-2]. As the *Volino* Court observed, "Merritt did not, and likely could not, opine on how the WCTL software or calculations should be adjusted to calculate damages in that way." 2023 WL 2532836, at *4. However, simply because Merritt does not know where other adjustments may be made if the PSA is removed from Mitchell's calculation does not invalidate his opinion that removal of the PSA would ultimately render an accurate ACV. *See id.* (holding that "[b]ecause Merritt opined that an appraiser would not apply the PSA as Progressive does but would apply all of the other adjustments in the 'comp' methodology, Merritt's opinion that a proper appraisal could consist of Progressive's methodology minus the PSA is reliable and helpful.").

In reaching this conclusion, the Court has specifically considered Defendant's assertion that it would be impossible to recalculate ACV for Plaintiff and others similarly situated if the PSA is removed because they do not retain certain underlying data which was used to calculate a total loss vehicle's ACV. [Doc. 75-2, p. 5-6]. In making this assertion, Defendant relies upon the declaration [Doc. 75-2] and deposition testimony of Philip Kroell ("Kroell"), a Mitchell employee who serves as an appraisal lead consulting on the WCTL program. To be sure, J.D. Power's WCTL Manual [Doc. 142-4], which explains how its program is used to value total loss vehicles,

demonstrates that the process used to initially calculate the individual dollar amounts which are then used to value a total loss vehicle is detailed and complex. However, once the computer program has processed the information utilizing the outlined methodology, it produces a valuation report containing the individual amounts calculated. *See* [Doc. 141-21]. The method for using those numbers to then determine the ACV for a total loss vehicle is contained in the report itself and appear to be straightforward.[16] [Doc. 141-21, p. 9].

Despite Defendant's contention that the content of Kroell's declaration and testimony demonstrate why there must be a fresh valuation process using the WCTL program if the PSA is removed, the WCTL report itself states that the PSA is applied only to the comparable vehicles listed in the report and that the PSA is calculated independently of any other adjustment. [Doc. 141-21, p. 9]. For these reasons, any changes required in the dollar amounts assigned to the other adjustment values contained in the report would be necessitated by the increase in the base value of the comparable vehicles resulting from removal of the PSA, as opposed to being necessitated because the PSA somehow directly factored into the original calculation of the dollar amount assigned to those other adjustments. As such, the process outlined in the report used by Defendant to calculate ACV supports Merritt's contention that removing the PSA would yield an appropriate ACV.

Finally, even if Plaintiff's theory as described by Merritt does not yield an exact calculation of damages, it is sufficient to demonstrate that damages are susceptible of being measured across a class and exact calculations are not required. *Comcast Corp. v. Behrend,* 569 U.S. 27, 35, 133

---

[16] Certain discrepancies exist between the explanation of the valuation process provided by Kroell and those contained in the WCTL manual and valuation reports filed as exhibits in this matter. The Court finds that the information contained in the manual and report must take precedence over Kroell's testimony given that these documents were developed outside of the litigation process and are held out by Mitchell and Defendant as accurately reflecting the method used to value ACV for total loss vehicles.

(2013). Instead, they must be consistent with a plaintiff's theory of liability. *Id.*; *Volino*, 2023 WL 2532836, at *11; *see also Hicks v. State Farm Fire and Casualty Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (observing that "[a]lthough 'individual damages calculations do not preclude class certification under Rule 23(b)(3),' a court must ensure at the class-certification stage that plaintiffs' formula calculates damages based only on their theory of liability." (quoting *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013) and citing *Rikos v. P&G Co.*, 799 F.3d 497, 523 (6th Cir. 2015)). Here, the Court finds that the methodology proposed by Merritt, while perhaps not yielding an exact calculation of damages, is reliable and consistent with Plaintiff's theory. For these and the other reasons stated above, Defendant's motion to exclude the report and testimony of Jason Merritt is **DENIED**.

### c. Kirk Felix

Kirk Felix ("Felix") is expected to offer testimony which 1) addresses how used vehicles are priced in the modern auto industry, 2) explains how a vehicle might sell for more or less than list price when dealers can make up anticipated profits in other ways, such as through use of in-house financing or service agreements, and 3) explains why the list price of used vehicles reflects ACV. [Doc. 144, p.18]. Essentially, Felix opines that used car dealers no longer list vehicles above market value in anticipation of consumers' efforts to negotiate price and instead list vehicles at market value because consumers now use the internet to compare prices of similar vehicles and choose to purchase the vehicle with the lowest list price. [Doc. 136, p. 13]. Defendant argues that Felix's testimony is inadmissible for several reasons. First, Defendant argues that Felix's testimony is unreliable because it is not based upon any methodology and instead is based entirely upon anecdotal narratives about the auto industry. *Id.* at p. 14. Defendant further takes issue with the fact that Felix did not conduct research or analyze data regarding the sale prices of used

vehicles before reaching his opinion. *Id.* Defendant notes that it is not arguing that Felix is unqualified to offer any opinions based on his experience, rather that his opinion regarding auto pricing practices "easily lends itself to testing and substantiation, [and his] conclusions based only on a personal opinion and experience do not suffice and are unreliable under Daubert and its progeny." *Id.* at p. 15-16 (citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 431 (6th Cir. 2007)). Put another way, Defendant argues that Felix's experience in the automotive industry standing alone is not broad enough to support his opinion regarding the pricing practices of all dealers nationwide. *Id.* at 16.

Defendant further argues that Felix's testimony would be unhelpful to the trier of fact. *Id.* at p. 17. According to Defendant, Felix's knowledge of the used car industry is second-hand because most of his personal experience is with the pricing of new vehicles. *Id.* at 17. Additionally, Defendant points out that Felix has conceded that there are times when used vehicles sell for below list price. *Id.* As such, Defendant asserts that Felix's knowledge is essentially the same as that of an average consumer and lay juror, and boiled down, his opinion is really nothing more than a statement that used cars sometimes sell for list price and at other times do not. Further, Defendant argues that Felix's report is based on "hypothetical and speculative theories" because Felix has not reviewed or analyzed the data in this case, meaning that his testimony would include the type of misleading opinion evidence likely to confuse the jury. *Id.* at p. 18.

Finally, Defendant asserts that Felix is unqualified to offer opinions regarding the Mitchell valuation reports or PSA. *Id.* at p. 19. Defendant contends Plaintiff is offering Felix's testimony to undermine Defendant's use of the PSA since it is his opinion that used car dealers do not list inventory above market price. *Id.* Defendant alleges this is improper because Felix does not know what data the PSA is based on, or how the PSA is calculated or applied. *Id.* For these reasons,

Defendant asserts that propriety of Mitchell's calculation and application of the PSA are beyond the scope of Felix's expertise, and as such, Felix's proposed testimony should be excluded. *Id.*

In response, Plaintiff asserts that Felix's testimony is reliable and will be helpful to the trier of fact, and points to other courts that have permitted the proposed testimony under similar circumstances. [Doc. 144, p. 18] (citing *Brown,* No. 3:21-cv-175-TCB, Doc. 124, at p. 6; *Drummond*, 2023 WL 5181596, at *6-7; *Clippinger*, 2023 WL 7213796, at * 5). Plaintiff responds to Defendant's assertion that Felix's testimony is unreliable because it is based solely on personal experience by arguing that expert opinions offered based on specialized knowledge, as opposed to scientific knowledge, do not have to be based upon testing, experiments, or other data and may in fact be based on personal experience alone. [Doc. 144, p. 18] (citing *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F. 3d 319, 335 (6th Cir. 2001)). As to Defendant's assertion that Felix should have consulted studies or data to inform his opinion, Plaintiff argues that the jury will be presented with a large amount of data demonstrating that vehicles typically sell for list price and Felix's testimony will assist jurors in understanding the market forces that cause vehicles to sell for list price. *Id.* at p. 19. Plaintiff asserts that Felix's long history of working with car dealerships as they have adapted to the internet-driven marketplace is a sufficient basis for his opinions. Plaintiff further contends that Felix's testimony about these market forces will assist the trier of fact in understanding whether Defendant's practice of discounting vehicles that sold for list price or above as outliers and the application of the PSA itself are justified. *Id.* at p. 20-21.

Plaintiff also asserts that Defendant's argument that Felix should have analyzed data to determine how often vehicles sell for below list price is misplaced because Felix's role is not to testify as to what the data reveals regarding vehicle sale prices. *Id.* at p. 19. Plaintiff states that statistician experts Dr. Michelle Lacy and Jeffrey Martin will opine regarding what the sales data

reveals, rather than Felix. *Id.* Plaintiff further explains why Felix's opinion that used cars sometimes sell for less than cash value for specific reasons, which he will explain during his testimony, will demonstrate the reasons the analysis of such data would not have been helpful to him in forming his opinion. *Id.* at 19-20. Further, Plaintiff asserts that Defendant may cross-examine Felix regarding any inconsistencies in his opinion and sales data, but that the existence of data that may conflict with Felix's opinion goes to the weight and not admissibility of Felix's testimony. *Id.* at p. 20. Finally, as to Defendant's assertion that Felix is unqualified to testify regarding Mitchell's calculation and application of the PSA, Plaintiff states that Felix is not attempting to offer and does not intend to offer any opinions regarding how the PSA is calculated or Mitchell's methodology. *Id.* at p. 22.

Felix received a bachelor's degree in business from the University of Colorado-Denver in 1986 and has been employed in the automotive industry in various roles ever since. [Doc. 73-3, p. 2]. For much of his career, he was an automotive executive moderator and consultant and assisted over 300 dealerships in improving profitability and operations. *Id.* He also consulted with dealerships about "adapting to the changes in the industry brought about by the internet." [Doc. 143-4, p. 3]. Additionally, he has knowledge of what pricing and inventory management tools are used in the industry, such as V-Auto. *Id.* As an initial matter, the Court finds that Felix's many years of experience working in the car industry, including specific experience related to pricing, profits, and adapting to a more internet-driven marketplace, qualifies him as an expert in the pricing and sales of vehicles. *See Clippinger*, 2023 WL 7213796, at *5. The core of Felix's proffered opinion testimony is that in the current automotive industry "vehicles are priced to market and used car dealers do not deviate down from the advertised cash price, with limited exceptions that are not related to the market value of the car, but rather related to add-on products

or how the transaction is structured or financed." [Doc. 143-4, p. 3]. Defendant argues that this opinion is unreliable because data reflecting the list and sale prices of vehicles is available, but Felix did not review any such data in formulating his opinion. [Doc. 136, p. 15]. If Felix were opining as to the frequency that used vehicles sell for list price, the Court might find Defendant's argument persuasive.[17] However, Defendant's argument relies upon an oversimplification of Felix's opinion; thereby, missing the mark. Further, the case upon which Defendant relies for this argument, *Johnson v. Manitowoc Boom Trucks, Inc.,* 484 F.3d 426 (6th Cir. 2007), is readily distinguishable from the case at hand. In *Johnson*, the expert testimony in question involved an engineer's opinion that an interlocking outrigger trigger system designed for a specific type of heavy equipment vehicle could be integrated into a different heavy equipment vehicle without having done any testing to see if his theory was possible or safe. While such a technical theory easily lends itself to, and even necessitates, testing, such is not true of Felix's theory regarding the practices and behaviors of car dealerships related to pricing. *See First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F. 3d 319, 332-35 (6th Cir. 2001) (holding that non-scientific expert opinions do not have to be confirmed through empirical analysis to be reliable and admissible).

Felix's proffered opinion is not simply that vehicles can generally be expected to sell for list price. Rather, Felix's opinion is that, based upon his extensive personal knowledge of and experience in the automotive industry, "the listed price [of a used vehicle] best reflects the market price, and it would be unusual for a dealer to accept a lesser price without shifting its profits to other components of the transaction." [Doc. 143-4, p. 5]. Contrary to Defendant's assertion, such

---

[17] In support of its motion to exclude Felix's expert testimony, Defendant cites to a portion of Felix's May 11, 2023 deposition where Felix says that he cannot provide a specific percentage of the time when consumers do not try to negotiate. While that is a different question than how often used vehicles sell for below list price, the Court notes that Felix was questioned extensively throughout his April 12, 2023 deposition about his ability to opine about various percentages related to the sale of used cars and he categorically stated that he could not provide specific percentages that more directly address this question. For the reasons stated above the Court finds that both areas of inquiry are appropriate fodder for cross-examination as opposed to grounds to exclude Felix's testimony.

a nuanced opinion regarding dealer pricing and sales practices does not easily lend itself to testing and substantiation. "[E]ven expert opinions that do not necessarily lend themselves to scientific testing and peer review may otherwise be admissible, such as where the expert has extensive practical experience in a field." *Blevins v. Kirk*, No. 18-5369, 2019 WL 5151310, at *3 (6th Cir. May 22, 2019) (citing *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F. 3d 319, 332-35 (6th Cir. 2001)). Here, Felix's opinion is reliable because it is based upon extensive practical experience in the automotive industry.

Defendant's argument that Felix's testimony would be unhelpful to the jury because his knowledge regarding list versus sale prices of vehicles is essentially the same as that of a lay juror is also unpersuasive. Despite Defendant's suggestion otherwise, Felix's knowledge of the inner workings of the car industry enables him to offer opinions regarding the pricing and sales of used vehicles that go far beyond a statement like "used cars sometimes sell for list price and sometimes they do not." [Doc. 136, p. 17]. In fact, Defendant's own assertions regarding vehicle pricing would bear this out. Throughout the pleadings in this matter, Defendant contends that used vehicles almost universally sell for less than their listed price unless being sold by a company specifically advertising itself as "no-haggle." Felix's experience has provided him with knowledge upon which he can rely to attempt to rebut that assertion. While Defendant tries to argue that Felix's report on this topic is misleading because it is based upon speculation, the Court finds that his opinion regarding why cars now typically sell for their list price but do sometimes sell for below list price is based on his lengthy experience in the car industry, including his significant experience assisting car dealerships in increasing profits, rather than on mere speculation.

While much of Felix's knowledge on the topic of pricing was obtained by talking to others in the automotive industry, those conversations occurred in the course of Felix's work as a

consultant and moderator, including during meetings that were specifically held to address financial performance, as opposed to through casual conversation or conversations held because he was serving as an expert in this litigation. *See* [Doc. 135-15, p. 6]. Defendant may well be able to use what it asserts are inconsistencies between Felix's opinions and available data to effectively undercut his opinions through cross-examination, but that does not render his opinions inadmissible simply because they are not based on empirical data. *See Helping Hands Home Improvement, LLC v. The Erie Ins. Exchange*, No. 3:21-cv-00008, 2022 WL 1063605, at *6-7 (M.D. Tenn. Apr. 8, 2022) (finding a witness qualified as an expert based on lengthy experience even when outside data was not consulted in forming his opinions and explaining that defendant was free to cross examine him on any inconsistencies between his opinion and other data). Felix's report provides specific reasons why used cars might sell below their initial list price that are not directly related to the market value of the car with these opinions being based upon his personal experience in the industry. *See* [Doc. 143-4]. Such information would be useful to the jury in understanding the relationship between list price, sale price, and ACV. *See Clippinger*, 2023 WL 7213796, at *5.

Defendant specifically argues that Felix is unqualified to opine as to Mitchell's valuation process or application of the PSA. [Doc. 136, p. 19]. While Plaintiff has stated that Felix is not attempting, and does not intend, to offer opinions about how the PSA is calculated or the underlying Mitchell methodology, Felix's report does include a section on Mitchell's valuation process. [Doc. 143-4, p. 6-7]. However, Felix has admitted that he does not have sufficient knowledge regarding Mitchell's process and underlying data to form an opinion as to the methodology's reliability. [Doc. 135-21, p. 11].[18] Accordingly, for clarity of the record, the Court

---

[18] In its Reply, Defendant acknowledged Plaintiff's concession that Felix's opinion should be limited to exclude testimony related to the PSA. [Doc. 146, p. 8].

specifically finds that Felix is prohibited from providing testimony directly addressing Mitchell's methodology.

Based upon the foregoing, the Court finds that Felix is qualified to testify regarding the pricing and selling of used vehicles in the current auto market. The Court further finds that Felix's opinions on this topic are reliable and helpful to the trier of fact. At the same time, Felix does not have sufficient knowledge about Mitchell's data or valuation methodology to render a reliable opinion regarding Michell's valuation process and as a result he will be prohibited from offering testimony as to that matter. Accordingly, Defendant's motion to exclude the report and testimony of Felix is **GRANTED in part and DENIED in part** such that Felix's testimony may not include any opinions regarding Michell's valuation process.

## IV.    MOTION TO CERTIFY CLASS

"A district court has broad discretion to decide whether to certify a class." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013) (citing *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)); *see also Hicks*, 965 F.3d at 457. However, Rule 23 of the Federal Rules of Civil Procedure "establishes strict requirements for class certification, obligating prospective class-action plaintiffs to satisfy all of the conditions of Rule 23(a) and come within one provision of Rule 23(b)." *Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1089 (6th Cir. 2016). The four "threshold requirements" that are applicable to all class actions are:

> (1) numerosity (a class so large that joinder of all members is impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical of the class); and (4) adequacy of representation (representatives will fairly and adequately protect the interests of the class).

*Id.* at 1089-1090 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997)). Here, the Court will begin by determining whether Plaintiff can meet all four of these requirements and if

so, will likewise determine whether she can meet the Rule 23(b) requirements. Plaintiff is seeking certification pursuant to Rule 23(b)(3), which requires her to demonstrate "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available means for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Whirlpool*, 722 F.3d at 851; *see also Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017). The Sixth Circuit has held that "Rule 23(b)(3) classes must also meet an implied ascertainability requirement." *Hicks*, 965 F.3d at 464. A class is ascertainable if the class definition is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Id.* (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012)).

The party moving for class certification bears the burden of "affirmatively demonstrating" Rule 23 compliance. *Sandusky*, 863 F.3d at 466-67 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Class certification is proper only when, after a rigorous analysis, the court is satisfied that the Rule 23 requirements have been met. *Dukes*, 564 U.S. at 350-51. Such analysis will often "entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 351. Put another way, it is "sometimes necessary for the court to probe behind the pleadings" because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 351 (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982)). At the same time, the Supreme Court has made it clear that this rigorous analysis standard does not grant the court "license to engage in free-ranging merits inquiries at the certification stage." *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 466 (2013)).

Questions regarding the merits of a case may be considered only to the extent that they are relevant to determine whether the Rule 23 requirements for class certification have been met. *Id.* Simply stated, "district courts may not 'turn the class certification proceedings into a dress rehearsal for the trial on the merits.'" *Whirlpool*, 772 F.3d at 851-52 (quoting *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012)).

Here, Plaintiff seeks to certify a single class of individuals that made a claim on a policy issued by Defendant and received compensation for the total loss of a vehicle where the compensation amount was based on a Mitchell valuation report and the PSA was applied resulting in a decreased ACV. Plaintiff asserts that all Rule 23(a) prerequisites for class certification are satisfied, and contends the class meets the Rule 23(b)(3) requirements for certification. Plaintiff points out that her claims, and those of prospective class members, are based upon identical form contract language and uniform practices by Defendant. [Doc. 138, p. 4]. In response, Defendant argues that Plaintiff has failed to meet the Rule 23(a) prerequisites of commonality, typicality and adequacy of representation and that Plaintiff fails to meet the predominance and superiority requirements of Rule 23(b)(3). [Doc. 142].

### a. Article III Standing

As an initial matter, the Court will address Defendant's argument that class certification is not appropriate here because determining Article III standing will necessitate an individualized inquiry. Article III standing requires a showing that a plaintiff has suffered an injury-in-fact that was caused by the defendant's conduct and such injury can likely be redressed by the court with a decision for the plaintiff. *Kanuszewski v. Michigan Dep't of Health and Hum. Servs.*, 927 F.3d 396, 405 (6th Cir. 2019); *see also Glennborough Homeowners Assoc. v. United States Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021) (explaining that Article III standing requires the plaintiff to

clearly allege facts that "demonstrate a concrete and particularized injury" which is "fairly traceable to the defendant's unlawful conduct" and is "likely to be redressed by the requested relief."). "This standard aligns with the one governing motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), meaning…[the plaintiff] must assert a plausible claim for why [she] has standing to pursue [these claims]."[19] *Glennborough Homeowners Assoc.*, 21 F.4th at 414. "For a court to grant class certification, each member of the proposed class must have Article III standing." *Drummond*, 2023 WL 5181596, at *11 (citing *TransUnion LLC v. Ramirez*, 549 U.S. 413, 431 (2021)).

Defendant argues that to satisfy the damages prong of the Article III standing requirements, "each putative class member must establish that they were paid less than their vehicle's ACV." [Doc. 142, p. 21]. More specifically, during oral argument Defendant argued that insureds who received no direct compensation payment for their total loss claims, because the entire settlement amount went to their lienholders, do not have Article III standing. *See* [Doc. 153, p. 2].[20] Defendant contends that insureds whose total loss claims were paid entirely to lienholders were not entitled to compensation for the total loss of their vehicles. *Id.* Defendant argues that in such circumstances, the only party who could have been injured if Defendant indeed paid less than the ACV for a total loss vehicle is the lienholder. *Id.* On the other hand, Plaintiff argues that Defendant "harmed Plaintiff and class members by keeping money to which the insureds are entitled,

---

[19] The District Court has already determined that Plaintiff has stated a plausible claim for breach of contract and breach of the covenant of good faith and fair dealing. [Doc. 56].

[20] The Court notes that counsel for both parties misunderstood the instruction the Court gave during oral argument regarding the filing of supplemental authority on the issue of Article III standing. The Court asked that the parties each file a notice containing a list of cases that provided authority on this issue and to include for each a one-paragraph summary. Instead, apparently the parties understood the Court to direct that they file a single, one paragraph summary of all the cases they wished to cite for this proposition. Regardless, the Court has reviewed the parties' supplemental filings as to this issue [Docs. 153, 154].

irrespective of whether they in turn owe that money to a lienholder." [Doc. 154, p. 1] (citing *Drummond*, 2023 WL 5181596, at *11).

Defendant points to *Thole v. U.S. Bank, N.A.*, 590 U.S. --, 140 S.Ct. 1615 (2020) in support of its contention that insureds whose full compensation was paid to a lienholder do not have Article III standing.[21] However, Defendant's reliance on *Thole* is misplaced. In that case, two retired participants in U.S. Bank's defined-benefit retirement plan brought suit under the Employee Retirement and Security Act ("ERISA") and alleged violations of ERISA's duties of loyalties and prudence. *Thole*, 140 S.Ct. at 1618-19. In contrast to the case here, there was no breach of contract claim. *Id.* The *Thole* court held that the plaintiffs lacked Article III standing because they would still receive the same amount of money whether they won or lost the suit because the retirement plan at issue was a defined-benefit plan and the amount of retirement benefits to which the plaintiffs were entitled was the same regardless of any alleged mismanagement of the fund. *Id.* at 1618. As a result, the court noted that "the plaintiffs themselves [had] no concrete stake in the lawsuit." *Id.* at 1619. Conversely, here, the amount owed to Plaintiff and prospective class members will be higher if they win the lawsuit than if they do not, even if that money ultimately goes to a lienholder. Defendant also argues that "the *Volino* court explicitly recognized that a definition that encompassed insureds whose settlement proceeds went to third parties would 'create an Article III standing problem for the class.'" [Doc. 153, p. 1] (quoting *Volino*, 2023 WL 2532836, at *10). However, the *Volino* court did not fully analyze the Article III standing of such class members because those insured were not members of the class as defined in *Volino*. *Id.*[22] As

---

[21] Defendant cited two additional cases in its Notice of Supplemental Authority, one from the Fifth Circuit and one from the District of Vermont. The Court has considered this non-binding authority but given the available in-Circuit authority, the Court finds it unnecessary to fully address them.

[22] After the *Volino* opinion was issued, the *Drummond* court addressed this issue and found that the requirements of Article III standing were satisfied because "the class members have been potentially 'denied the benefit of [their] bargain,' which constitutes an injury in fact." *Drummond*, 2023 WL 5181596, at *11 (quoting *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018)).

such, it would be inappropriate for the Court to rely upon this dicta as to the issue of Article III standing.

The Court finds *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 637 (2023) to be instructive regarding this issue. In *Tyler*, the Supreme Court held that the plaintiff was financially harmed by the county's retention of surplus proceeds from a tax-foreclosure sale, even though the foreclosed home was encumbered by debts exceeding the surplus amount. *Id.* Defendant attempts to distinguish the case at hand from *Tyler*, arguing that Defendant was contractually obligated to pay insured's lienholders directly, whereas no such obligation existed in *Tyler*. *Id.* The Court does not find this argument persuasive because the *Tyler* court explained that, simply put, the plaintiff suffered financial harm because the county kept money that belonged to the plaintiff. *Id.* The same principle is true here: if Defendant paid less than ACV for an insured's totaled vehicle, it has kept money that belongs to the insured, regardless of whether all original settlement money was paid to a lienholder. Additionally, while Defendant correctly asserts that "loss for a covered auto will be made according to [the insured's] interest and the interest of any lienholder shown on the declarations page," the Policy goes on to state that "[a]t [Defendant's] option, payment may be made to both [the insured and lienholder] jointly, or to either separately." [Doc. 67-3, p. 27]. As such, Defendant could elect to pay a lienholder directly, but the terms of the Policy did not require that it do so.

Additionally, the Sixth Circuit has held that the denial of "the benefit of the bargain" is sufficient to establish an injury for purposes of Article III standing. *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018).[23] More specifically, the *Springer*

---

[23] The Fifth, Ninth, and Eleventh Circuits have also issued similar holdings. *Springer*, 900 F.3d at 287 (citing *North Cypress Med. Ctr., Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 192-94 (5th Cir. 2015); *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1289-91 (9th Cir. 2014); *HCA Health Servs. Of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001)).

court explained that in "any private contract claim, [the plaintiff's] injury does not depend on allegation of financial loss. His injury is that he was denied the benefit of his bargain." *Id.* Such is the case here. If Plaintiff's assertions are correct, she and the prospective class members were denied the benefit of their bargain with Defendant when they received less than ACV for their total loss vehicles.

In sum, if a breach of contract occurred in the manner alleged by Plaintiff, she and members of the putative class suffered a concrete injury because they were denied the benefit of their bargain with Defendant through being deprived of ACV for their totaled vehicles. *See Drummond*, 2023 WL 5181596, at *11 (citing *Springer*, 900 F.3d at 287). Additionally, this concrete injury is "fairly traceable" to Defendant's alleged breach of contract and is "likely to be redressed by the requested relief." *See Glennborough Homeowners Assoc.*, 21 F.4th at 414. Accordingly, the Court concludes that Plaintiff and all prospective class members satisfy the requirements of Article III standing.

### b. Rule 23(a) Requirements

#### i. Numerosity

The numerosity requirement of Rule 23(a) provides that the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "While no strict numerical test exists to define numerosity under Rule 23(a)(1), 'substantial' numbers of affected consumers are sufficient to satisfy this requirement." *Whirlpool*, 772 F.3d at 852 (citing *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006)). Here, Plaintiff asserts that, based upon claims data provided by Defendant, the total number of class members exceeds 22,000. [Doc. 138, p. 20]. Indeed, Defendant has not contested satisfaction of the numerosity requirement. [Doc. 142]. Accordingly, the Court finds that Plaintiff has satisfied the numerosity requirement.

### ii. Commonality

Rule 23(a) also requires that "there are questions of law or fact common to the class." Fed. R. 23(a)(2). This requirement is generally referred to as "commonality." *See Whitlock*, 843 F.3d at 1089-90. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349-50 (quoting *Gen. Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). "This does not mean merely that they have all suffered a violation of the same provision of law." *Id.* at 350 (quoting *Falcon*, 457 U.S. at 157). Rather, the plaintiffs' claims "must depend upon a common contention…[that] must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* At the same time, "[c]ommonality does not require that Plaintiffs' claims be identical." *Eddleman v. Jefferson Cnty., Ky.*, 96 F.3d 1448, at *3 (6th Cir. 1996) (table). The crucial inquiry for commonality is whether the class-wide proceeding has the capacity to provide common answers to resolve the litigation. *Davis v. Cintas Corp.*, 717 F.3d 476, 487 (6th Cir. 2013).

Plaintiff asserts that "[c]ommonality is satisfied because whether [Defendant's] application of the PSA to comparable vehicles' listed prices constitutes a breach of the form Policy is subject to common proof, and thus its answer will apply equally to all Class members." [Doc. 138, p. 13]. More specifically, Plaintiff contends that the central question in this case is whether the application of the PSA to comparable vehicles during the valuation process means that Defendant was not paying its insureds ACV for their totaled vehicle as required by the Policy but was, instead, paying them an artificially reduced amount. *Id.* at p. 14. According to Plaintiff, whether such a breach occurred turns on two questions: (1) whether the PSA is invalid, and (2) whether removal of the PSA from insureds' valuation reports will yield an accurate ACV under the comp appraisal

methodology. *Id.* at p. 13. Plaintiff also points out that she and all prospective class members were subject to the same policy language and business practices; thus, answering the question of whether one contract was breached would answer the question of whether every contract was breached. *Id.* at p. 14; [Doc. 138-3, p. 3-5].

In response, Defendant argues that the validity of the PSA does not matter for the purposes of Plaintiff's claims. [Doc. 142, p. 18]. Instead, Defendant takes the view that a breach of contract only occurs if an insured is paid less than ACV for their total loss vehicle. *See id.* Further, Defendant contends that even if some PSAs were applied incorrectly, there is no common evidence as to which class members were paid less than ACV as the result of a flawed PSA. *See id.* at p. 20. Simply put, Defendant argues that the question of whether a prospective class member received less than ACV is individualized, and therefore commonality is not satisfied. *See id.* at p. 18-20.

Defendant's arguments are unpersuasive because they misunderstand why Plaintiff claims application of the PSA is a breach of contract.[24] "The PSA purports to project the outcome of uncertain future sales using aggregate data from past sales of similar vehicles." *Volino*, 2023 WL 2532836, at *8. Defendant claims the PSA is based upon patterns identified in sales data that demonstrate consumers are likely to negotiate a reduction in list price when purchasing a used car. Plaintiff's contention is not that any given PSA was wrong, but that the application of the PSA in general is wrong because the PSA is based upon manipulated data. *Id.* "Whether applying the PSA was a legitimate methodology, and whether [Defendant] misled insureds about it, does not depend on whether the PSA's predictions occasionally came true." *Id.* Thus, a common answer may be

---

[24] The Court acknowledges that Plaintiff has also asserted a claim for breach of the covenant of good faith and fair dealing; however, a breach of the covenant of good faith and fair dealing is not an independent basis for relief. *Davidson v. Arlington Cmty. Schs. Bd. of Educ.*, 847 F. App'x 304, 310 (6th Cir. 2021). Rather, a claim for breach of the covenant of good faith and fair dealing is construed as a claim for breach of contract. *Id.* As such, the Court will only reference Plaintiff's breach of contract claim in its analysis.

31

reached by determining whether the application of the PSA to Defendant's chosen comparable vehicles during the valuation process did or did not violate the contract. *See Drummond*, 2023 WL 5181596, at *9. As a result, questions of the validity of the PSA and whether removal of the PSA will result in a correct ACV are common to the class and are subject to common proof. *See id.*

Moreover, even if, as Defendant contends, there may be factual differences in the claims of class members, this does not defeat commonality because commonality does not require that all class members' claims be identical. *Eddleman*, 96 F.3d at *3. Commonality is satisfied if the plaintiff demonstrates that the class members have suffered the same injury. *Dukes*, 564 U.S. at 349-50. Here, Plaintiff and all potential class members are alleged to have suffered the same injury when the ACV of their total loss vehicles was determined by application of the PSA, which may be determined on a class-wide basis. Accordingly, the commonality requirement is satisfied.

### iii. Typicality

Another requirement for class certification is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. 23(a)(3). This requirement is commonly referred to as "typicality." *See Whitlock*, 843 F.3d at 1089-90. "Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims.'" *Whirlpool*, 722 F.3d at 852 (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998)). In other words, a plaintiff's claim is generally typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if [the] claims are based on the same legal theory." *In re. Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996). "[T]ypicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th

Cir. 2007) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998)). "This requirement [e]nsures that the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members." *Whirlpool*, 722 F.3d at 852-53. At the same time, "[i]f the court 'may properly attribute a collective nature to the challenged conduct[,]' then the named plaintiff's claims do not have to be identical to the claims of the rest of the class." *Clippinger*, 2023 WL 7213796, at * 8 (quoting *Beattie*, 511 F.3d at 561).

Here, Plaintiff argues that typicality is satisfied because all the claims arise from the same alleged conduct and share the same essential characteristics. [Doc. 138, p. 22]. Plaintiff again notes that Defendant's practices regarding application of the PSA are uniform, and the case turns on whether this uniform practice is appropriate under the terms of the Policy. *Id.* On the other hand, Defendant alleges that the named plaintiff does not fit into the proposed class definition because she did not "receive" any payment from Defendant given that her full settlement amount was paid to Plaintiff's lienholder. [Doc. 142, p. 29]. In response, Plaintiff takes the position that Plaintiff received benefits from Defendant when it issued payment to Plaintiff's lienholder on her behalf. [Doc. 139, p. 20]. The Court agrees that Plaintiff can be deemed to have "received" payment from Defendant for her total loss vehicle even though the funds to which she was entitled under the Policy were directed to a lienholder.

As such, the Court finds that Plaintiff and all other potential class members share common facts and a common legal question. *See Clippinger*, 2023 WL 7213796, at * 8. The common factual allegation here is that in calculating the ACV for their totaled vehicles, Defendant applied a PSA to the listed price of comparable vehicles which is inconsistent with the current used auto market and resulted in Defendant paying them less than ACV for their vehicles. [Doc. 138, p. 3]. The

common legal question is whether Defendant breached its contract when it applied the PSA. *See id.* at p. 13. In other words, Plaintiff's claim is typical because "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members," and it is based on the same legal theory as the claims of other class members. *In re. Am. Med. Sys., Inc.*, 75 F.3d at 1082. Thus, Plaintiff has satisfied the typicality requirement.

### iv. Adequacy of Representation

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The purpose of this requirement is to "uncover conflicts of interest between named parties and the class they seek to represent." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997)) (internal quotation marks omitted). Adequacy of representation is "essential to due process, because a final judgment in a class action is binding on all class members." *Am. Med. Sys.*, 75 F.3d at 1083 (citing *Hansberry v. Lee*, 311 U.S. 32 (1940)). "The Sixth Circuit has articulated two criteria for determining adequacy of representation: '1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 576 (E.D. Tenn. 2014) (quoting *Young*, 693 F.3d at 543). In addition, the Court should "determine whether class counsel is qualified, experienced, and generally able to conduct the litigation." *Id.* (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000)) (internal quotation marks omitted). The Sixth Circuit has noted that "[t]he adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of other class members." *Am. Med. Sys.*, 75 F.3d at 1083; *see also Cosby v.*

*KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2020 WL 3548379, at *10 (E.D. Tenn. June 29, 2020).

Defendant argues that Plaintiff has failed to meet the adequacy requirement of Rule 23 for two primary reasons. First, Defendant argues that the proposed class includes insureds who benefitted from Defendant's ACV calculation. Defendant points to the declaration of Jonathan Walker, Ph.D., which alleges that WCTL's implicit assumption that all comparable vehicles are in typical condition creates a bias in favor of overestimating loss vehicle value. [Doc. 142, p. 28; Doc. 142-1, p. 4]. Defendant appears to argue that this "condition bias" means that some members of the class benefitted from the same conduct that harmed other class members; thus, Plaintiff cannot adequately represent the interests of both sets of class members. *See* [Doc. 142, p. 28]. This argument is inapplicable here because, as previously stated, Plaintiff's sole point of contention with Defendant's valuation methodology is the application of the PSA. The question of whether Defendant overestimated an element of the ACV calculation aside from the application of the PSA is a question separate from this litigation because the only dispute here involves one specific adjustment used in the valuation formula, the PSA, and it is "easily segregated and quantified." *See* [Doc. 139, p. 10] (citing *Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700, 711-12 (5th Cir. 2020)).

Secondly, Defendant argues that Plaintiff is an inadequate class representative because "she has chosen to jeopardize potentially valuable class claims by focusing exclusively on the PSA." [Doc. 142, p. 29]. The Court finds this argument unpersuasive because "[w]hile the putative plaintiff[] [has] waived any non-PSA-related claims, this action is pursued under Rule 23(b)(3), which, critically, gives potential class members an opportunity to opt out." *Drummond*, 2023 WL 5181596, at *9; *see also Volino*, 2023 WL 2532836, at *11 (finding adequacy was satisfied despite the existence of waived claims because "the marginal value of any waived claims appears to be

relatively low, while the strategic value of pursuing claims on behalf of a…class is substantial.").[25]

Despite Defendant's arguments to the contrary, the Court concludes that Plaintiff has satisfied both prongs of the adequacy requirement. *See Young*, 693 F.3d at 543. As to the first prong, Plaintiff has a common interest with the unnamed members of the class because, as explained in the sections above, Plaintiff's breach of contract claim is applicable to all members of the class. Further, the Court finds that Plaintiff here "has presented no claims that would be detrimental to the class interests, and all [c]lass members would benefit from a finding that the PSA is improper and constitutes a breach." [Doc. 138, p. 22]; *see also Clippinger*, 2023 WL 7213796, at *10.

As to the second prong, Plaintiff asserts that she has "retained qualified counsel with experience litigating class action cases and [who] are committed to expending the resources to prosecute this claim." [Doc. 138, p. 22-23]. This argument is supported by the declaration of Plaintiff's counsel. [Doc. 137-12]. Further, Defendant has provided no evidence or argument to the contrary. *See* [Doc. 142, p. 28-30]. Additionally, the Court notes from the interactions between counsel during the hearing held in this matter and the statements that they made to the Court, both Plaintiff's and Defendant's counsel are involved in a number of similar cases pending in other jurisdictions. Further, counsel for the parties specifically advised the Court that they had made many of the same arguments in multiple other forums. Having found that Plaintiff has meet all the requirements of Rule 23(a), the Court will now turn to the requirements of Rule 23(b)(3).

### c. Rule 23(b) Requirements

#### i. Ascertainability

In the Sixth Circuit, Rule 23(b)(3) classes must satisfy a threshold ascertainability

---

[25] In addressing adequacy of representation, Defendant repeats its argument that Plaintiff does not fit into the proposed class definition. The Court has addressed this argument in the Typicality section.

requirement. *Sandusky*, 863 F.3d at 471. To satisfy the ascertainability requirement, the "class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Id.* (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012)).

Plaintiff argues that the proposed class is ascertainable because class membership can be determined "based on objective, identifiable criteria in the electronic claims data and documentation maintained by [Defendant]." [Doc. 138, p. 12] (citing in support *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th Cir. 2012)). While Defendant has not specifically addressed the issue of ascertainability, its Response essentially argues that the class is not ascertainable because individual inquiries would be necessary to determine class membership. [Doc. 142, p. 31].

The Sixth Circuit has found ascertainability to be satisfied where the class was defined by reference to objective criteria. *See Am. Copper & Brass, Inc.*, 757 F.3d at 545 (finding ascertainability to be satisfied when class membership could be determined by reference to objective data); *see also Young*, 693 F.3d at 538. The objective criteria for this class are: (1) an insured who submitted a total loss claim; (2) based on a policy issued by Defendant to a resident of Tennessee; (3) during a defined time period; (4) where payment was made based on a Mitchell report; and (5) the report included application of the PSA. Plaintiff contends that class members can be identified based only on Defendant's own data. [Doc. 138, p. 12]. Defendant does not refute this contention but instead asserts that such identification would require a manual review of the data. [Doc. 142, p. 31]. Even if true, the need for manual review does not necessarily defeat ascertainability. *See Young*, 693 F.3d at 539 ("[T]he size of a potential class and the need to review files to identify its members are not reasons to deny class certification.").

Defendant alleges that Plaintiff's own statistical expert, Dr. Michelle Lacey, testified that she would not be able to identify all members of the class simply by looking at the claims data stored by Defendant and copies of the related Mitchell valuation reports. [Doc. 142, p. 31]. However, the full context of Dr. Lacey's testimony is that *based only on the data that was presented to her during her deposition*, she could not definitively say that she could identify all class members by simply looking at Defendant's claims data and stored Mitchell reports. [Doc. 142-7, p. 6]. At the same time, Dr. Lacey's report explains that, while class members can be identified from Defendant's claims data and the Mitchell reports, the initial claims data produced by Defendant for purposes of this litigation was overinclusive, but this could be remedied by simply filtering the spreadsheet data to meet a variety of parameters. [Doc. 138-6, p. 9-12]. While it is possible that Defendant's own recordkeeping practices may make identifying potential class members somewhat time consuming, this does not mean the class is not ascertainable. *See Curran v. Progressive Direct Ins. Co.*, No. 22-cv-00878-NYW-MEH, 2023 WL 8715699, at *9 (D. Colo. Dec. 18, 2023) (citing *Volino*, 2023 WL 2532836, at *10 n.1).

The Court finds the criteria for class membership is based on objective criteria and is sufficiently definite. As such, the Court finds that members of the class would be appropriately ascertainable.

## ii. Predominance

Rule 23(b)(3) specifically requires Plaintiffs to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" by carefully examining

the relationship between common questions and individual questions in a case. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting *Amchem*, 521 U.S. at 623).

> An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.

*Id.* (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196-97 (5th Ed. 2012)). Simply put, predominance "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* In determining whether a putative class meets this standard, "courts are to assess 'the legal or factual questions that qualify each class member's case as a genuine controversy,' and assess whether those questions are 'subject to generalized proof, and thus applicable to the class as a whole.'" *Sandusky*, 836 F.3d at 468 (quoting *Amchem*, 521 U.S. at 623 and *Bridging Cmtys., Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016)). "[T]he fact that a defense 'may arise and may affect different class members differently does not a compel a finding that individual issues predominate over common ones.'" *Beattie*, 511 F.3d at 564 (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000)). Further, "common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damages issues." *Id.*; *see also Clippinger*, 2023 WL 7213796, at *11.

In determining predominance, courts must "give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Once a common question has been identified, as has been done in this case, the court must then ask whether this common question is more prevalent or important than any individualized issues that may exist. *Id.* Importantly, "[w]hen 'one or more of the central issues in the action are

common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages…"' *Id.* (quoting 7AA C. Wright, A Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123-124 (3d ed. 2005)).

The Court has already determined that the issue of whether Defendant's application of the PSA was a breach of contract is common to the class. The question now becomes whether this issue will predominate over any individual questions. Defendant argues that individualized issues predominate. Specifically, Defendant argues that to prove damages or standing, each putative class member must first establish that they received less than their vehicle's ACV, which is an individualized inquiry. [Doc. 142, p. 21]. This is essentially a repeat of the arguments Defendant made against Article III standing and commonality. As discussed earlier when the Court addressed commonality, the core issue in this case is whether Defendant breached its contractual obligation to pay insureds the ACV for their total loss vehicles when it applied the PSA during the valuation process, as opposed to what value should be assigned to any given comparable vehicle to which the PSA was applied. As another district court tackling the same issue recently observed, "what matters here is that '[t]he putative plaintiffs do not challenge the price for which PSAs predict each car will sell; rather they challenge the application of PSAs altogether.'" *Curran v. Progressive Direct Ins. Co.*, No. 22-cv-00878-NYW-MEH, 2023 WL 8715699, at *9 (D. Colo. Dec. 18, 2023) (quoting *Drummond*, 2023 WL 5181596, at * 10). After all, and as discussed more specifically in addressing the admissibility of Merritt's expert testimony, if Plaintiff succeeds in demonstrating that a PSA should never be applied, it would be difficult for Defendant to suddenly argue that other aspects of its valuation process are likewise flawed. Thus, the predominant question in this matter is whether application of the PSA to the comparable vehicles used to obtain the ACV for total loss

vehicles resulted in a breach of Defendant's contract with insureds. Assuming the answer to this question is yes, damages may differ among the class members, but this does not defeat predominance. *See Clippinger*, 2023 WL 7213796, at *11; *see also Tyson Foods*, 577 U.S. at 453.

Moreover, several other courts considering whether to certify a class under circumstances essentially identical to the ones here have found that common issues predominate. *See e.g., Drummond* 2023 WL 5181596; *Brown*, No. 3:21-cv-175-TCB, Doc. 124; *Volino* 2023 WL 2532836; *Curran*, 2023 WL 8715699. Further, the cases upon which Defendant relies heavily in support of its argument against certification are non-binding on this Court and distinguishable. For example, the plaintiffs in *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134 (9th Cir. 2022) alleged a violation of a technical state regulatory statute and, relying on the theory that the statutory violation established both liability and damages, did not offer any common proof of damages, nor did they argue that their insurer underpaid them. Here, however, Plaintiff has specifically alleged that insureds were underpaid due to Defendant's application of the PSA in its valuation process, and have provided a common method for calculating damages, removal of the PSA from the WCTL valuation reports, that matches the theory of liability. *See Clippinger,* 2023 WL 7213796, at *12 (distinguishing both *Lara* and *Ngethpharat v. State Farm Mu. Auto. Ins. Co.*, No. C20-454 MJP, 2022 WL 1404526 (W.D. Wash. May 4, 2022) from a case factually similar to the one at hand); *see also Volino*, 2023 WL 2532836, at * 9 (distinguishing both *Richardson v. Progressive Am. Ins. Co.*, No. 18 Civ 715, 2022 WL 154426 (M.D. Fla. Jan. 18, 2022) and *Curtis v. Progressive N. Ins. Co.*, No. 17 Civ. 1076, 2020 WL 2461482 (W.D. Okla. May 12, 2020) because in those cases the plaintiffs merely argued "Progressive's valuations were wrong because they did not match valuations from the National Automobile Dealership Association ("NADA"), but did not show that NADA valuations constituted 'actual cash value' as required by the contracts.").

In sum, the Court finds that the common question of whether Defendant breached its contract when it applied the PSA in calculating the ACV of insureds' total loss vehicles predominates over any individualized issues in this case. As previously stated when addressing questions of standing and commonality, regardless of whether the answer to this question is yes or no, it is equally applicable to all class members. Further, the question of breach must be answered before any individualized issues may even arise. Additionally, Plaintiff has established a common theory for calculating damages if application of the PSA was indeed a breach—the PSA can simply be removed from the class members' valuation reports to determine ACV. Therefore, the Court finds that the predominance requirement is met.

### iii. Superiority

In addition to the predominance requirement, Rule 23(b)(3), also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). There are four factors that the Court must consider in determining whether Plaintiffs have demonstrated that a class action is the superior means for adjudicating the dispute, which are 1) whether there would be an interest by individual class members in prosecuting their actions separately; 2) if class members have other litigation pending about the controversy, the extent and nature of that litigation; 3) the desirability of this forum for the action; and 4) what difficulties would be expected in managing the class. Fed. R. Civ. P. 23(b)(3).

Defendant argues that none of the superiority factors weigh in favor of certification here. [Doc. 142, p. 30]. In short, Defendant argues that class members have a strong interest in controlling their individual actions so that they may pursue their most valuable claims and that insureds in Tennessee can take advantage of alternate dispute resolution procedures, such as

appraisal.[26]

The Court notes that that Plaintiff's alleged individual damages are $485.86, and from the information presented, it is likely that the damages of other class members will be comparable. It is difficult to see how plaintiffs would pursue such claims individually when the amounts at stake are relatively small when compared to the cost of litigation against a large insurance company. It is also difficult to fathom that individuals with claims of this size could justify retaining counsel to represent them as to those claims. As such, the Court finds Plaintiff's assertion that individual class members are unlikely to wish to prosecute their claims individually is well-founded. [Doc. 138, p. 23]; *see Beattie*, 511 F.3d at 567 ("Such a small possible recovery would not encourage individuals to bring suit, thereby making class action a superior mechanism for adjudicating this dispute."). For these reasons, this factor weighs in favor of class certification.

As to other litigation, the Court is unaware of any similar litigation in Tennessee pending against Defendant, and Plaintiff asserts that there is none. [Doc. 138, p. 23]. Further, Defendant has not advised of any such litigation. As such, this factor weighs in favor of class certification.

Plaintiff's arguments that the class is manageable are primarily the same ones made in favor the class being ascertainable. Given that the Court has already found the class to be ascertainable, the Court will address only Plaintiff's additional assertion that class treatment here is far more manageable than roughly 22,000 individual cases. *See Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 415-16 (6th Cir. 2018) (explaining that the purpose of superiority is, in part, "to achieve economies of time, effort, and expense…") (quoting *AmChem*, 521 U.S. at 615) (internal quotation marks omitted). In response, Defendant contends that appraisal may be a superior method of addressing insureds' claims. In considering these arguments, the Court notes

---

[26] Defendant further argues that a class action would be unmanageable because the class is unascertainable. The Court has already addressed the ascertainability of the class and sees no reason to repeat the ascertainability discussion here.

that the aim of the superiority requirement is to determine the superior method of adjudication, and in Tennessee, appraisal is not adjudication. *Clippinger,* 2023 WL 7213796, at *15 (citing *Merrimack Mut. Fire Ins. v. Batts*, 59 S.W.3d 142, 145 (Tenn. Ct. App. 2001)). Even if Defendant's proposed approach constituted adjudication, the Court would still find that addressing these matters on a class basis is by far the superior mechanism. Accordingly, the Court finds that this factor likewise weighs in favor of certification.

Given the above, and after conducting a rigorous analysis, the Court finds that Plaintiff has satisfied all requirements set forth in Rule 23 necessary to justify certifying a class in this matter. For this reason, the undersigned **RECOMMENDS** that Plaintiff's Motion for Class Certification be **GRANTED**.

## V. CONCLUSION

Based upon the foregoing, Defendant's Motion to Exclude the reports and testimony of Jason Merritt, Kirk Felix, and Jeffrey Martin [Doc. 135] is **GRANTED in part** and **DENIED in part** as fully set forth above. While the Court's ruling as to Document 135 addresses the *Daubert* motions previously filed in this matter, for clarity of the record, the Clerk's Office shall document the following rulings as to those previously filed motions: Defendant's initial Motion to Exclude the Report and Testimony of Jeffrey Martin [Doc. 72] is **DENIED without prejudice** as premature; Defendant's initial Motion to Exclude the Report and Testimony of Kirk Felix [Doc. 73] is **GRANTED in part** and **DENIED in part**; and Defendant's initial Motion to Exclude the Report and Testimony of Jason Merritt [Doc. 76] is **DENIED**. Additionally, for the reasons set

forth above, the Court **RECOMMENDS** that Plaintiff's Motion for Class Certification [Docs. 67, 137] be **GRANTED**.[27]

So ordered and respectfully submitted,

/s/Cynthia Richardson Wyrick
United States Magistrate Judge

---

[27] Objections to this Report and Recommendation must be filed within 14 days after service of this recommended disposition on the objecting party.  28 U.S.C. 636(b)(1); Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Fed. R. Civ. P. 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).